# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **K. I., by and through** | ) | |
| **her mother and next friend,** | ) | |
| **JENNIE I., and JENNIE I. individually** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **MONTGOMERY PUBLIC SCHOOLS,** | ) | **CV 2:06-CV-905-MEF** |
| | ) | |
| **Defendant.** | ) | |

## MOTION TO FILE REPLY TO DEFENDANT'S
## RESPONSE TO PLAINTIFFS' MOTION TO AMEND COMPLAINT

Come now, plaintiffs, by and through counsel, and hereby moves this Honorable Court to accept the attached Reply, which plaintiffs seek to file in response to defendant's response (Doc. No. 22) to plaintiff's Motion to Amend Complaint. (Doc. No. 18). Consequently, plaintiffs request that this Honorable Court accept for filing plaintiffs' Reply to Defendant's response to Plaintiffs' Motion to Amend Complaint. (Exh. A).

WHEREFORE, plaintiffs respectfully request that this Honorable Court grant their Motion and receive their Reply to Defendant's response to Plaintiffs' Motion to Amend Complaint.

Respectfully submitted,


s/Deborah A. Mattison
Deborah A. Mattison
Audrey R. Channell
Attorneys for Plaintiff

**OF COUNSEL:**
**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**
The Kress Building
301 19th Street North
Birmingham, Alabama  35203
(205) 314-0500

## CERTIFICATE OF SERVICE

I do hereby certify that I have on April 2, 2007, filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Buddy Scott
James R. Seale
Erika P. Tatum


s/Deborah A. Mattison
OF COUNSEL



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| K. I., by and through | ) | |
| her mother and next friend, | ) | |
| JENNIE I., and JENNIE I. individually | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO.: |
| MONTGOMERY PUBLIC SCHOOLS, | ) | CV 2:06-CV-905-MEF |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND COMPLAINT

Come now, plaintiffs, by and through counsel, and hereby reply to defendant's response to plaintiff's Motion to Amend their Complaint, as follows:

1.     Plaintiffs' initial complaint stated claims under both the Individuals with Disabilities Education Act (IDEA), as well as § 504.  29 U.S.C. 794.  Plaintiffs seek to amend that complaint to describe plaintiffs' allegations in more detail, to add a request for compensatory damages relative solely to plaintiffs' claims under § 504; 29 U.S.C. 794, and to revise plaintiffs' citations to IDEA 2004.  While IDEA 2004 became effective in July 2005, the federal regulations implementing the statute were not effective until October 2006.

**Plaintiffs Have Exhausted Their Administrative Remedies.**

2.     Paragraph 5 of defendant's response states that "the additional allegations in plaintiffs' amended complaint raised new claims that were not addressed in the due process hearing held." Defendant does not identify what "new" claims plaintiffs' amended complaint raises.[1]   In fact, other than plaintiffs' request for compensatory damages under § 504, plaintiffs' amended complaint simply provided more detail regarding plaintiffs' original allegations. As is evident by a review of plaintiff's post hearing memorandum, which was submitted in lieu of closing argument, all of the allegations were presented to Hearing Officer Cole. *See*, for example, Post Hearing Brief, pp. 3, 23-28, 40-44, 48-52 (Exh. 1).

3.     Further, defendant appears to misunderstand application of the exhaustion requirement. In order to bring a claim under another statute, a party must exhaust his or her administrative remedies by pursuing a due process hearing under IDEA. In pertinent part, IDEA provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies under the... ADA, Title V of the Rehabilitation Act, or other Federal laws protecting the rights of children with disabilities... except that before the filing of a civil action under such laws, exhaustion of administrative remedies must be met.

---

[1] Clearly defendant is not objecting to the inclusion of the § 504 claim, given that defendant made no such objection to plaintiffs' initial complaint.

2

20 U.S.C. § 1415(l), 34 C.F.R. 300.516 (e). This statute, known as the Handicapped Children's Protection Act, was passed swiftly by Congress in 1986 to undo the effects of the U.S. Supreme court's decision in *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L. Ed.2d 746 (1984), which had held, *inter alia*, that IDEA was an exclusive remedy. Accordingly, a parent may file separate claims provided that the parent, as is true here, exhausted the administrative remedies under IDEA.

4.   As to plaintiffs' request for compensatory damages, plaintiffs' request for an impartial due process hearing, as well as plaintiffs' post hearing brief, expressly requested compensatory damages. (Exh. 2). However, since Hearing Officer Cole could only award equitable relief and had no jurisdiction under Section 504, he had no authority to award compensatory damages.

5.   Further, defendant cannot seriously dispute that plaintiffs have the right to bring a damage action against under § 504 which incorporates by reference the remedies of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, *et seq*; 42 U.S.C. § 12132). Under Title VI, compensatory damages are available. *Barnes v. Gorman*, 122 S.Ct. 2097 (2002).

6.   Defendant has also misinterpreted *Alabama Administrative Code § 290-080-090.10(4)(c)12*. That section deals with the time line concerning the appeal of plaintiffs' IDEA claim. Plaintiffs complied with the time line. Further, any additional

request for relief would, at the very least, relate back to plaintiffs initial complaint under Federal Rule of Civil Procedure, Rule 15(c), as it arises out of the facts set forth in plaintiffs' original complaint.

### Plaintiffs' Citations to IDEA 2004 Are Proper.

7.     Defendant also contests the fact that plaintiffs' amended complaint referencing the citations contained in IDEA 2004, and its implementing regulations, the latter which were effective October 13, 2006. However, the administrative hearing did not conclude until 2006 and, Kristin's program for the 2005-2006 school year was one of the issues before Hearing Officer Cole. Since K.I. remains at the Children's Center in essentially the same program, the issues before this Court concern both the District's past, as well as its current, alleged failure to provide K.I. with a free appropriate public education (FAPE).[2] Thus, IDEA 2004 is relevant.

8.     Plaintiffs' intent in relying on the citations contained in IDEA 2004, was also to avoid any unnecessary confusion. Plaintiffs thought it would be extremely confusing to cite to a Federal statute or regulation which, perhaps because of the regulation has been renumbered, no longer applied.[3] For example, in IDEA 1997, 34

---

[2]The reference to Hearing Officer Cole's statement on page 86 is misplaced, given that he was stated only that he would not hold the District accountable for the IEP requirements contained in IDEA 2004, until the revised statute became effective.

[3]Additionally, a few of the original cites were incorrect.

4

CFR 300.26 defined "special education." That term is now defined in 34 CFR 300.39. Since much of the law surrounding K.I.'s current rights under IDEA 2004 is either very similar, or virtually identical to IDEA 1997, plaintiffs felt it was appropriate to cite to the current law.

WHEREFORE, plaintiffs respectfully request that this Honorable Court grant their Motion to Amend their Complaint.

Respectfully submitted,

<u>s/Deborah A. Mattison</u>
Deborah A. Mattison
Audrey R. Channell
Counsel for Plaintiffs

5

**OF COUNSEL:**
**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**
The Kress Building
301 19th St. North
Birmingham, Alabama  35203
(205) 314-0500

## CERTIFICATE OF SERVICE

I do hereby certify that I have on April 2, 2007, filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Buddy Scott
James R. Seale
Erika P. Tatum

s/Deborah A. Mattison
OF COUNSEL

**1**

# STATE OF ALABAMA
# DEPARTMENT OF SPECIAL EDUCATION

| | |
|---|---|
| **Jennie Ingram, on Behalf of Her** | ) |
| **Daughter, Kristin Ingram** | ) |
| | ) |
| **Petitioners,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **Montgomery Public Schools,** | ) |
| | ) |
| | ) |
| **Respondents.** | ) |

## I.    THE FACTUAL RECORD

Kristin is a ten year old child who has arthrogriposis, a form of muscular dystrophy, and restrictive lung disease.[1]  Kristin's arthrogriposis causes significant atrophy in her muscles and she has extensive contractions in her joints. Kristin's movements are extremely restricted.  Kristin can move her head some and move her arms if they are low.  Kristin is fed through a tube; and, she is sometimes suctioned, depending on her level of congestion.  Both the feeding and suctioning are skills that a lay person can learn to perform.  (TR 475-477, 495-496, 545, 675, 989).  Kristin also needs hand splints to keep her hands in a functional position.  Without the splints, Kristin's hands are stuck in a fist or a "duck bill" position.  (TR 477-478).  Arthrogriposis is treated via an extensive amount of physical and

---

[1]Kristin's arthrogriposis and muscular dystrophy are non-progressive and have been present since her birth. Kristin was fed by mouth until she was four years old. (TR 515). Kristin spoke until age two. (TR 504).

occupational therapy to keep Kristin as limber as possible. (TR 520). One of Kristin's biggest needs

is her ability to communicate.

A.    **Although Kristin has been A Student in the Montgomery Public School System Since 1998, To Date, Montgomery County Schools (MPS) has Never Comprehensively Evaluated Kristin.**

Although Kristin has been a student in the MPS since 1998, the District has, to date, failed to

comprehensively evaluate Kristin's needs.

On September 18, 1998, the District conducted its first MEDC on Kristin. The District

assessed Kristin's vision and hearing and it completed an adaptive developmental profile on her. The

District identified Kristin as being eligible for special education services under the category of multi-

disability. (Petitioners' Exh. 16). In so certifying Kristin, the District failed to fully evaluate Kristin's

occupational or physical therapy needs. (TR 1932; Petitioners' Exh. 38). While, Cindy Howitz,

conducted an OT "assessment" of Kristin, on January 10, 2000, a review of the assessment indicates

that it is entirely anecdotal.[2]  (Petitioners' Exh. 38, TR 155, 1137-1139).

Kristin originally wore hand splints, which she grew out of approximately four years ago. Ms.

Ingram has asked for an occupational therapy evaluation of Kristin to secure new splints because the

lack of splints makes Kristin's movements even more difficult. No evaluation has been conducted.

(TR 676-680; Petitioners' Exh. 27). The District's physical therapy information is largely anecdotal.

(District's Exh. 35). Neither Kelly Fuller nor Lori Russell, the District's speech and language

therapists, have ever evaluated Kristin or assessed Kristin's ability to utilize a switch. Neither therapist

---

[2]Howitz recommended occupational therapy consultative services one time per month. The report states
that as early as January 10, 2000, Kristin was able to activate a switch. (Petitioners' Exh. 38).

2

is particularly knowledgeable about augmentative communication devices. (TR 542, 1433-1435, 1495).

On May 11, 2001, the District completed its first -- and last -- speech and language evaluation of Kristin. (Petitioners' Exh. 29). The evaluation occurred due to Ms. Ingram's concern about the District's failure to provide Kristin with speech and language services. (TR 228, 2212). Dr. Denise Gibbs, who conducted the evaluation, recommended that the District develop Kristin's communication skills through the extensive use of technology, including switches and battery adaptive toys, to strengthen Kristin's ability to identify objects and pictures, and make choices. Dr. Gibbs also recommended that Kristin receive an assistive technology evaluation in order to determine the appropriate type of switch to be used, proper switch placement and proper seating and positioning. Gibbs stressed that it was important that these interventions be used throughout Kristin's day. (Petitioners' Exh. 29). With limited exception, the District failed to implement Gibbs' recommendations. As will be discussed, there is no evidence that the use of switchers and/or communicative opportunities were ever infused throughout Kristin's day. No assistive technology evaluation was completed. (Petitioners' Exh. 37; TR 1052-1054).

To date, the District has never evaluated Kristin's IQ or her academic functioning. At the time of the hearing, the District had no idea whether Kristin had mental retardation. (TR 537, 887, 1438, 1531). More currently, the District never attempted to evaluate Kristin until her parents secure a attorney. (TR 902, 941).[3]

_____

[3] Yolanda, who supervises the Center programs, has no information about Kristin's condition or her abilities. (TR 30-34, 39-43, 49-50).

**B.**    **Since, at least, 2000, Kristin has been Placed At the Children' Center.**

Kristin began to attend the Children' Center in 2000.  MPS advised Mr. and Ms. Ingram that

the "only place in town" where Kristin could be educated was at the Center.  (TR 685).  From 2000

until August 2005, when she was placed on homebound services for the first time, Kristin spent the

majority of her time either in a segregated program at the Center, or at home with no educational

services.  (TR 40).  With the exception of one or two visits from students without disabilities to the

Children's Center, Kristin has been educated in a program which provides services solely to students

with severe disabilities.  No other student in Kristin's classroom has had typical speech patterns.

(1439).  Some years, none of the students were able to talk.  (TR 1451).  Many of the students also

have/had mental retardation.  (TR 184, 503-504, 1939).  No evidence exist that Kristin would not

benefit from contact with typical children, or that Kristin's IEP goals could be implemented in a special

education class, in a regular school setting with mainstreaming opportunities.  (TR 70-71, 352-353,

431). While the District staff testified about implementing IDEA's LRE mandate, staff clearly had no

idea what that mandate requires.  (TR 2150).

While at the Center, Kristin has received little to no physical, occupational or speech and

language therapy services.  (TR 504-505).  This is in part because the Center operates as a consultive

model for related services.  (Petitioners' Exh. 36).

**C.**    **The Districts's IEPs For Kristin Have Failed To Offer Her An Appropriate**
        **Educational Program.**

From, at least, January 18, 2002 until the present, Kristin's IEPs have been ill designed and

inappropriate to meet her needs.  The IEPs failed to meaningfully address Kristin's significant

communication, socialization and academic needs; and, they have repeatedly contained goals and objectives which were either unrealistic or which targeted skills which Kristin already possessed. Although Kristin could barely move and could not speak, the District failed to utilize assistive technology.

Broken down to their basics, Kristin's IEPs were essentially limited to the following goals: making eye contact, activating a switch, rolling, reaching, wearing her glasses and receiving oral motor stimulation. (Petitioners' Exh. 2, 7, 20, 21). There were no academic goals. The IEPs did not consider the results of any evaluations to identify Kristin's present level of educational performance. Nor, did the IEPs describe how Kristin's disabilities related to her ability to progress in the general curriculum. The IEPs contained only a very limited statement of the special education and related services and supplementary aids. None identified services to be provided to Kristin to allow her to be involved in and progress in the general curriculum.

The District was well aware that Kristin has "a history of medical concerns, which caused her to have frequent absences from school." However, Kristin's IEPs do not address her need for homebound or alternative services during the times that Kristin is absent. Kristin's January 2003 IEP also states that Kristin will receive speech consultation one time weekly and physical therapy consultation on a monthly basis. Relative to her communication/sensory awareness goal, the IEP states that Kristin will receive one-on-one instruction within the classroom on a daily basis **if possible** for fifteen minute sessions. While the benchmark related to switch activation "independently two times in fifteen minutes/2/5 trials." The IEP did not contain Kristin's present level of performance concerning Kristin's then current ability to activate a switch. The same is true with regard to Kristin's "eye

5

contact" goal. (Petitioners' Exh. 2).

Kristin's March 5, 2004 IEP contains, essentially, a word-for-word restatement of Kristin's

student profile. The only change is a notation that Kristin was diagnosed with Muscular Dystrophy and

a statement regarding the number of absences Kristin had in the 2002-2003 school year was removed

from the profile. Kristin's communication sensory awareness goal is identical, with the same notation

that staff will work with Kristin on a daily basis **if possible** for fifteen minute sessions. The remaining

goals are also consistent. (Petitioners' Exh. 7). Other IEPs had additional difficulties, and none of them

meaningfully addressed Kristin's need for, *inter alia*, related services or assistive technology.

Ms. Ingram testified that, at each IEP, she requested additional educational and related

services, such as physical therapy, and equipment, to include a desk. (TR 2216-2217, 2220-2224,

2230-2234). When Ms. Ingram indicated her interest in having Kristin taught numbers, colors or the

alphabet, she was informed that the Children's Center did not teach these skills. (TR 572).[4]

Although Kristin has several physical limitations, she has been able to make choices and

maintain eye gaze since approximately four or five years of age. (TR 477-480, 557, 2027; Plaintiffs'

Exhs. 39, 40, 41, 42, 43). Mr. and Ms. Ingram attended Kristin's IEP meetings and told the District

that Kristin already knew how to "eye gaze" at various objects. However, MPS continuously refused

to modify Kristin's goals. (TR 477-480). Kristin has also been able to activate switches for years;

and, she mastered "cause and effect" at age five or six. The Ingrams began working with switches "on

their own," because "nobody was showing (them) how to do it." (TR 480-481, 1449; Petitioners'

---

[4]On March 5, 2004, the District decided to extend Kristin's 2003 IEP due to Kristin's previous surgeries. (Petitioners' Exh. 6).

Exhs. 9, 38). Kristin has been communicating her desires for approximately the last four to five years.

(TR 509-510, 752). Further, despite the District's continued insistence on continuing the goal that

Kristin will roll and reach, Kristin will never be able to roll from side to side and/or reach. (TR 510-

514, 548, 552-553, 754-756, 1089-1090; TR 1724-1725).

**D.    Kristin's Placement in Cartwright's Room Fails to Provide Kristin with a FAPE.**

Since August 2002, when Kristin was able to attend school, she has been educated in

Cartwrights' room. Cartwright is Kristin's case manager and she has the duty to assure comprehensive

and timely evaluations of Kristin. (TR 56, 156, 233). Cartwright has no medical background and

Kristin is the first child Cartwright has taught with arthrogriposis. The District provided no training to

Cartwright relative to Kristin's needs. (TR 136, 143). Cartwright admitted that Kristin's cognitive

abilities have never been evaluated. (TR 354). No academics were taught in Cartwright's class. (TR

174, 750).

Cartwright, who had little to no experience in evaluating students in the area of assistive

technology, did not conduct an assistive technology evaluation of Kristin. (TR 216-217). A review of

Cartwright's testimony indicates that while she was likely well meaning, her knowledge of the

appropriate selection and use of switches and mounts is very limited. (TR 179-182, 185-189).[5]

While Cartwright has some understanding of the purpose of assistive technology, she does not

have sufficient expertise in appropriately selecting and utilizing technology to meet Kristin's needs. This

was demonstrated, in part, by her testimony regarding some of the switch access sites which she

---

[5]Prim, who experimented with switches when working with Kristin, did not know how to select a switch
or a mount to meet Kristin's needs. (TR 1718-1719, 1747).

selected for Kristin. For example, Cartwright tried to use both a foot switch and a breast switch, despite the fact that Kristin has essentially no lower extremity movement and is respiratory compromised. Cartwright unrealistically expected Kristin to move her arms against gravity. (TR 324-325, 481-482). Cartwright also used switches which Kristin was otherwise physically unable to activate. (See District's Exh 26; TR 1750-1752). Despite her years with Kristin, Cartwright does not know how much pressure Kristin can exert. (TR 1995). Cartwright also did not collect critical data necessary to make informed decisions regarding the appropriate use of the technology.

Cartwright's lack of mounting systems was also problematic. (TR 1055-1056). While Cartwright indicated that she did not see consistency with regard to Kristin's cause and effect, she ignored legitimate issues which interfered with Kristin's ability to demonstrate her ability to perform the task. For example, Kristin may not have understood what she was being asked to do. Kristin may have been bored or fatigued. (See, Vogtle's Testimony). Cartwright never gave Mr. or Ms. Ingram a switch to use at home. No one from the District provided Petitioners with any parent training. (TR 315-316, 492, 1449).

Further, Mr. and Ms. Ingram have rarely, if ever, seen the District using switches with Kristin. (TR 483, 573, 750). In reviewing pictures of Kristin in Cartwright's classroom, either no switches are visible, or the switches are placed outside of Kristin's reach. (TR 2304-2305; See also Petitioners' Exh. 11; TR 1213; District's Exhs. 36, 27, 29). For example, Petitioners' Exh. 27 shows that Cartwright's placement of the switch was out of Kristin's sight range and physically unaccessible. (TR 2292). In Ms. Ingram's experience, a lot of times that the District claimed to be using a switch, the switch was not plugged into any device. Likewise, Prim never observed Kristin using switches in

8

Cartwright's room. (TR 1754-1755). Kristin's program in Cartwright's room also included sitting in a "Lazy Boy" recliner or lying on a mat for extensive time periods without any activity. (TR 483-485, 751, 1759, 2018-2019; 2306-2307). Kristin was required to "take a nap" each day, although there was no educational or medical rationale for this "downtime." (TR 314-315, 317, 319-320).

Kristin was largely without a table adaptive to her wheelchair or the use of a wheelchair tray. (TR 1453, 2290-2291, 2293-2294, 2301, 2305; District's Exhs. 27, 29, 36, 37; Petitioners' Exhs. 11, 12, 13). Although Cartwright testified otherwise, according to Russell, Kristin's wheelchair "had to be positioned sideways," against the table because it did not fit under the table. (TR 1454). Kristin did not use hand splints in Cartwright's class. (TR 678, 1745, 1925). Since Cartwright began working with Kristin, Kristin has received no direct occupational therapy services. (TR 154). (TR). During the 2003-2004 school year, Kristin received speech and language services five times. (TR 236).

Since first being placed in Cartwright's room, Kristin has regressed in various areas, including in her toileting skills. Prior to attending Cartwright's class, Kristin was on a toileting schedule and wore Pull-Ups. (TR 751). Cartwright insisted that Kristin wear diapers because diapers were easier for Cartwright. Diapers, however, are particularly uncomfortable for Kristin because they leak and because of Kristin's physical limitations. (TR 148-150, 490-491). Kristin has never been on a toileting program while at the Center. (TR 150, 751-752). Kristin has also regressed physically since attending the Children's Center in that, *inter alia*, her joints are more restricted. (TR 491-492). Cartwright admits that Kristin has only mastered one goal. (TR 2009-2010; see also 2213).

**E.    Ms. Ingram Becomes Concerned About the Lack Of Good Hygiene at the Center.**

In 2004, Ms. Ingram became alarmed about the Center's hygiene practices, including the District's commingling of feeding tubes, the lack of hot water and the effect the Center's lack of hygiene seemed to have on Kristin. (TR 497-504). In the fall of 2004, it appeared as if Kristin became sick when she attended the Center. As explained by Ms. Ingram, "Kristin was around normal children all summer and never became sick." However, upon Kristin's return to the Center, within days, she became ill. (Petitioners' Exh. 9; TR 696, 1268, 1270, 2242-2243). After Ms. Ingram raised her concerns, the relationship between the parties deteriorated. (TR 758-760, 1522). Ms. Ingram testified that, in addition to her previous concerns about Kristin's poor educational program, the hygiene issue was "the straw that broke the camel's back." (TR 2230-2232).

On September 7, 2004, Dr. Christopher Makris, Kristin's pediatric respiratory physician, wrote a letter to Chris Henderson which stated that Kristin needed to be in school. (Petitioners' Exh. 10). Dr. Makris wanted Kristin to receive her education in school, as did Mr. and Ms. Ingram. (TR 696-701, 919).

Kristin's last day at school was November 14, 2004, when Kristin left school sick. By that time, due to Ms. Ingram's concerns, Cartwright had essentially stopped speaking to Ms. Ingram. When Ms. Ingram picked Kristin up on November 14, 2004, she noticed that Kristin was very congested. Cartwright wheeled Kristin to Ms. Ingram and shoved a note in Kristin's diaper bag which said that Kristin was as congested as she had ever been. (TR 126, 1653, 1654). Thereafter, Ms. Ingram called the school and got into a heated debate, first with Cartwright, and, then with Henderson. Henderson told Ms. Ingram that if Kristin needed to be suctioned three times an hour, then she

10

shouldn't be in school.[6] (TR 2314-2317). On November 16, 2005, Ms. Ingram asked for a meeting

with the school, which was scheduled, but then canceled by the District. (TR 2318-2320). The

meeting was finally held in January 2005. The Ingrams deny that they refused to attend any meeting

during that time period. (TR 1654, 1965-1966).

When the parties met in January 2005, the Ingram's reiterated their concerns about Kristin's

educational program. (TR 2233-2237). Although Kristin had been out of school for almost two

months, the District did not complete an IEP at that meeting. (TR 2099).

Kristin's educational records were provided to her attorneys on March 3, 2005.[7]

On April 27, 2005, the District completed an IEP for Kristin which offered five hours of

homebound services. (Petitioners' Exh. 1). That IEP also had problems. For example, one of

Kristin's annual goals stated that when Kristin's name is presented she will respond with a smile two to

four times. There is no indication, however, of whether Kristin was already able to respond – in any

fashion – to her printed name at the time the IEP was written. Kristin's reading goal stated that she

would attend to stories for ten minutes or longer. Kristin, however, could already "attend" to stories.

(Petitioners' Exh. 26; TR 682, 743). Other goals were nonsensical. One of Kristin's math goal was

for her to draw five circles in space by making small circular motions with her arm with full support.

Kristin will never be able to raise her arms and make a circle; and, there is no indication of how the

activity will promote a math goal. (TR 744-745). Kristin's science/sensory awareness goal stated that

Kristin would activate a computer, without any assessment of whether Kristin could already perform

---

[6]It is unclear where the "three times an hour" limitation originated.

[7]On April 6, 2005, Petitioners, through counsel, requested an IEP meeting.

this activity.

**F.    The District Failed to Provide Homebound Services to Kristin when She was Absent.**

Since, at least 2001, due to Kristin's physical disabilities, including her need to undergo several surgeries, Kristin has been absent from school for a significant number of days each year. (TR 692, 2285). However, until April 2005, the District failed to make a *bona fide* offer of homebound services via an IEP. For example, the District did not offer homebound services to Kristin when she was out of school for four months recovering from knee surgery during the 2000-2001 school year. (TR 546-547; District's Exh. 35).

In October 2003, Kristin had spinal fusion surgery. After recovering from the surgery, Mr. and Ms. Ingram attempted to return Kristin to school. Staff from the District notified Ms. Ingram that, since Kristin was wearing a brace, Kristin could not return to school. (TR 575, 686-688, 757, 2251). The MPS did not offer Kristin any alternative educational services. (TR 237, 239, 248-249, 263-264, 412, 688, 701-702, 757, 2343-2347). Kristin remained out of school until February 2005, and then for most of March 2004.

While it is undisputed that the MPS failed to revise Kristin's IEPs to develop a homebound program until April 5, 2005, the record is unclear as to the existence of any oral offer of homebound services.[8] (TR 701-702). Ms. Ingram does not remember any "homebound" services offered prior to 2004. And, the Ingrams thought "homebound" education meant either that **they** were supposed to

---

[8] As will be explained, IDEA mandates that a district revise a student's IEP when it appears that the original IEP is ineffective or is not able to be implemented.

teach Kristin while she was at home, or that Kristin would receive only three hours of educational

services per week. (TR 762-763, 2284, 2341-2342). Although Ms. Ingram thought it was "weird"

that Kristin received no homework when out of school, she did not know what homebound services

were or that Kristin was entitled to them. (TR 2285-2286). According to Ms. Ingram, the District's

failure to offer services during the 2003-2004 school year was not surprising because it was so routine.

(TR 2286-2287).[9] Prior to April 2005, Cartwright has never sent any work, switches or activities for

Kristin to work on while out of school. (TR 1919-1920, 2287-2288). Cartwright admitted that Ms.

Ingram wanted Kristin in school. (TR 336).

Henderson testified that the Ingrams first refused homebound services in early 2005. (TR

2207). Henderson also admitted that homebound services were not discussed until Ms. Ingram

complained about the lack of hygiene at the Center and its adverse effect on Kristin. Henderson's

response to Ms. Ingram's concerns was that if the Center was making Kristin sick, maybe Kristin

should stay home. (TR 403-404, 450-451, 2203-2205, 2216).

Kristin turned seven years old on July 12, 2002. MPS acknowledges that the District was

mandated by law to educate all students, including Kristin, who are within the mandatory school

attendance age. The District also acknowledged that, if Kristin was unable to attend school due to her

health issues, it had a duty to develop an IEP for Kristin which offered homebound services. MPS

acknowledged that its failure to do so was is in violation of the Center's policy. (256, 339, 1521; See

Exh. 50). Kirkland knew that she could have requested a hearing under IDEA if the Ingrams were

---

[9]Prior to the fall of 2004, the Ingrams were never asked for a doctor's note to explain Kristin's absences.
(TR 2283).

uncooperative on this issue. (TR 1524). It is undisputed, however, that the first IEP which offered

homebound services did not occur until April 2005. (TR 1521-1522).[10] The District never contacted

anyone from the truancy office or protective services when Kristin was absent. (TR 123-1524).

    While the District blames Kristin's lack of progress on her absences, no one from the District

could explain why MPS did not develop an IEP to offer Kristin homebound services. Significantly,

there is no allegation that Kristin's absences were due to neglectful parents or that Kristin's absences

were not disability based. (TR 905, 1494).

### G.    Kristin Finally Attends Summer Classes In A Typical School.

    During the summer of 2005, Kristin, for the first time, received educational services in a self-

contained classroom at the Vaughn Road, where she was exposed to students without disabilities, and

she received some limited academics. (TR 705-706, 732-734, 1027, 1570). Vaughn Road has a full-

time nurse; and, the District sent an additional LPN to accompany Kristin to the program. (TR 496-

497, 893-894, 920, 1263-1264). No health or safety concerns existed as a result of Kristin's

placement in the program. (TR 732, 766). MPS typically assigns a speech and language and

occupational therapist to Vaughn. (TR 1027-1028). The summer of 2005 was also the first time that

Kristin received extended year services. (TR 692-693).

### H.    Dr. Vogtle Evaluates Kristin and Recommends Continued Placement Away
####        From The Center.

    In the summer of 2005, Dr. Laura Vogtle, an Associate Professor of Occupational Therapy at

---

[10]Prim never offered to provide physical therapy to Kristin when Kristin was absent from school. (TR
1711-1712).

the University of Alabama at Birmingham, conducted an independent educational evaluation.

(Petitioners' Exh. 36; TR 962-963). Dr. Vogtle, who has thirty five years practicing as an occupational

therapist in pediatric settings, has intensively worked with children who have a variety of disabilities.

(Petitioners' Exh. 35; TR 964-965, 967-968). Vogtle has worked in school settings and has

developed numerous IEPs. (TR 966-967). Dr. Vogtle has extensive experience with arthrogriposis

and assistive technology; and, she is an augmentative communication consultant with the Children's

Rehabilitation Services in Birmingham. Vogtle also has expertise in wheelchairs and environmental

controls which will allow an individual to operate equipment, open doors, etc. (TR 969).

Dr. Vogtle evaluated Kristin during three separate visits and reviewed Kristin's educational

records. She accompanied Kristin to the augmentative communication clinic in Montgomery and spent

time working with Kristin and her family at their home. Dr. Vogtle also visited the Children's Center

and the Vaughn Road Elementary School. (TR 977-978).

Kristin needs a communicative device which she can use to make choices and she will need

several access sites to appropriately use any assistive technology device. For example, one activation

point might relate to Kristin's use of her arms, which are straight in front of her and generally on her

legs. However, other activation points are needed, in part, because of Kristin's fatigue. (TR 975-976,

979-980). Multiple sites will also allow Kristin to activate different types of devices to activate

environmental controls. (TR 983).

Contrary to Cartwright's mode of operation, the first step to selecting switches necessitates a

detailed physical evaluation of Kristin's range of motion, muscle strength and positioning to identify in

which positions Kristin best operates. Part of this process involves not just finding an appropriate

15

switch, but also locating appropriate access points. It also includes positioning and maintaining the switch in the appropriate access point over a period of time. Allowing Kristin to access a switch by holding it in front of her is inappropriate. (TR 989-990).[11] It is also inappropriate to "pick" a switch and expect (Kristin) to use it. (TR 991). Kristin needs a very light resistance switch which can be placed close to her body.

Further, in selecting a switch and mount "exhaustive data collection" must occur. This should include examining such things as the time of day, Kristin's positioning, distractions in the room, and the activity in which Kristin is asked to participate. Such analysis will assist in identifying Kristin's motivation to use the switch. One would have to try each switch over an extended period of time, with extensive documentation to appropriately select the device. (TR 991-993). The District should have trained staff on the use of communication devices, including the appropriate use of mounts. (TR 993-995). Vogtle observed no mounts in Cartwright's classroom. (TR 1017).

When Dr. Vogtle evaluated Kristin, she noted that Kristin was responsive, demonstrated cause and effect, made eye contact and clearly communicated her feelings. (TR 998, 1023). While Dr. Vogtle could not assess Kristin's cognitive functioning, Kristin was appropriately socially responsive which indicates that Kristin likely did not have a low cognitive function. (TR 1035-1037). Dr. Vogtle was also surprised that the District had never assessed Kristin cognitively, as such assessment is critical to the design of an appropriate educational placement. (TR 1036-1038). No evidence exist that Kristin would not benefit from contact with typical children, or that Kristin's IEP goals could be

---

[11]Russell, too, acknowledged that she held switches in front of Kristin, although Russell knew that Kristin couldn't physically activate the switch. (TR 1442-1443).

implemented in a regular school setting with special education classes. (TR 70-71, 352-353, 431). While the District staff testified about implementing IDEA's LRE mandate, staff clearly had no idea what IDEA requires. (TR 2150).

When Dr. Vogtle visited the Children's Center, she observed six students, four of whom where in wheelchairs. All students were non-verbal and one young child was visually impaired. She sat alone, continuously poking at her eye without staff intervention. One young man was lying on a mat. (TR 108-109). While Cartwright used a big red switch during circle time, the students did not have switches set up on their own wheelchairs to allow them to choose when to participate. Nor did Cartwright use any picture icons. (TR 1012). Cartwright's use of switches in her class was inappropriate in that children were only allowed interaction when an adult gave them the opportunity to communicate. When one particular child was given a switch to activate, the other children just sat and waited for their turn. (TR 1031-1032).

During part of her day, Kristin needs to be educated in classes with students without disabilities. A class involving only significantly disabled peers is educationally malnourished. (TR 1014-1016). In a more inclusive environment, Kristin would have more opportunities to learn from her peers and a more enriched learning environment. (TR 1015-1016). Further, peer mediated learning also takes place where children without disabilities take on the role of helping a student with a disability. (TR 1015-1016). Nor, it is sufficient for Kristin to only occasionally have some interaction with children without disabilities, such as those who occasionally visit the Center. (TR 1142-1143).[12]

---

[12]Cartwright could not say whether any age appropriate students ever visited her class and she acknowledged that any visitation to the class occurred only once or twice. (TR 1991-1992).

Vogtle then visited Vaughn Road where she talked with the school nurse about handling feeding tubes and suctioning. The nurse there was comfortable performing both of these tasks. (TR 1024). In Dr. Vogtle's opinion and other benefits in the Vaughn Road placement significantly outweigh the benefits of placement at the Children's Center, which lacked a stimulating environment. (TR 1061).

Vogtle made the following recommendations: 1) Kristin needs a physical therapist to examine environmental issues and her lower extremity movement to make sure that Kristin is positioned appropriately; 2) Kristin needs direct and consultative occupational therapy to improve Kristin's range of motion and the therapist should have a technology background to offer assistance with the utilization of switches and switch mounts and to conduct an environmental modification evaluation. Kristin needs an environment which is adaptive to meet Kristin's needs (TR 1042-1045, 1048-1047); 3) Kristin needs an appropriate desk top easel, appropriate switch mounting systems, communicative devices and the use of picture symbols for communication (TR 1063-1069); 4) The Ingrams need parent training as a related service. Consistency in communication between various environments is critical and it would be important for the parents to understand how to support Kristin during the summer months. (TR 1087-1088).[13]

Vogtle believed that Kristin had the potential to learn considerably higher levels that presently given the opportunity, with appropriate intervention. (TR 1078-1079).[14] Kristin cannot play like other kids or perform all classroom activities, but she can interact with others. She can also sit at a table with other kids and enjoy activities. Right now she is a passive recipient. Kristin needs the opportunity to

---

[13]Kristin no longer needs oral motor stimulation. (TR 1069-1070).

[14]Prim, too, believes that Kristin has the potential for higher learning. (TR 527).

18

know that her opinion matters. This will not realistically occur at the Children's Center. (TR 1081-1083). Kristin's IEPs also contain no educational goals or activities which could not be implemented in a more inclusive setting. (TR 1084-1085). While Vogtle acknowledged that Kristin had been absent, she felt that the District should have provided homebound services. (TR 1079-1078).

Finally, Dr. Vogtle testified that Kristin's IEPs from 2001 to the present were not designed to provide reasonable educational benefits to Kristin. (TR 1088-1090). Thus, Kristin needs compensatory education. (TR 1093-1094).[15]

## I.    Locke's Evaluation, Too, Supports Placement of Kristin At A Location Other Than the Center.

Donna Locke also evaluated Kristin. (Petitioners' Exh. 28). Locke works at Children's Rehabilitation Services, where she oversees the augmentative and communication clinic. (TR 585-586). Locke has a Bachelor's Degree in Communication Disorders from the University of Montevallo and a Master's Degree in speech and language from Tennessee. She is a licensed speech therapist and she has obtained a national certificate of competence. Locke has also worked in several school districts; has worked with a number of augmentative communication devices and has assisted in writing numerous IEPs. (TR 581-586).

Locke's evaluation of Kristin focused on Kristin's ability to use augmentative communication technology; and, she testified that Kristin was very responsive and appeared to have good communication potential. Kristin understood the concept of "cause and effect." (TR 593-595). While

---

[15]Petitioners' Exhibit 38 recommends OT services once a month. Vogtle would have expected to see OT progress reports. Vogtle did not see any assessment in the record which would constitute a formal OT assessment. (1138-1139).

Kristin is essentially "trapped" in her body, Kristin's physical condition does not necessarily denote a cognitive impairment. (TR 598).

Locke recommended that Kristin be given a tray and a variety of switches, to include credit card switches, which are very small and require little pressure. (TR 595-596). Kristin could activate this type of switch if she needed to be changed or repositioned. (TR 596-597). Any communication system needs to be mobile and travel with Kristin. (TR 600-601). In addition, Kristin needs hand splints to support her ability to activate a device. (TR 601-602).

Locke believes that Kristin has the potential to learn more traditional academics, such as the alphabet, colors, numbers, etc. Kristin may well as have the potential of a typical student; and, Lock was very surprised that Kristin did not already have a communication system in place. (TR 597-599, 601-602). Locke further testified that Kristin's IEPs were/are not designed to deliver Kristin a FAPE. The goals were/are too difficult to measure and too broad. (TR 609-612). Locke also testified that the District failed to document Kristin's progress, or lack thereof. (TR 634-635).

One of Kristin's biggest needs is to receive direct speech and language therapy for at least one hour a week from a pathologist who has been trained to use augmentative communication. In addition, for at least one hour a day, Kristin needs to work on using her communication skills with a special education teacher. Communication opportunities also needs to be implemented throughout all of Kristin's day and Kristin needs "numerous opportunities to use switches throughout her such day." Allowing Kristin to only occasionally use switches will produce very different results than those with Kristin's consistent use of switches. Kristin must also be taught how to use her eyes to point to "desired and undesired objects." Further, while Kristin's IEPs dealt some with her expressive

20

language, they failed to address Kristin's receptive language needs. (TR 602-605, 616). Kristin

clearly had the potential to use an augmentative communication device and she must be afforded the

opportunity to effectively communicate. (TR 607-608). Unfortunately, however, it appeared to Locke

that Kristin's communication had regressed from May 2001, at least as to Kristin's vocalizing and using

eye gaze to indicate her desires. (TR 618-621, 625-626). Locke saw no evidence that Gibbs'

recommendations had been implemented. (TR 626- 628).

When asked what Kristin's potential would be if she was provided with a FAPE, Locke was

unsure, but believed that Kristin would have functioned at a higher level. (TR 628-629, 659). Locke

agrees that Kristin needs to be educated, part of her day, with kids without disabilities, in part to

motivate her to communicate. And, there is no reason she cannot attend a typical school. (TR 629-

632). She also believes that compensatory education should be provided to Kristin. (TR 630-631).

Finally, Locke testified that Kristin should have received homebound services when she was

unable to attend school. In her experience, the provision of homebound services was standard

procedure for a student who has disability-based absences. (TR 612-613).

**J.    The District Gives Kristin An Ultimatum for the 2005-2006 School Year –
        Placement at the Center or Homebound Services.**

After receiving Vogtle's and Locke's evaluation, the District refused to serve Kristin in any

setting, other than the Center or at home. (TR 899, 945-946). On August 12, 2005, an IEP meeting

was held to plan for Kristin's 2005-2006 placement. At the meeting, the District informed Petitioners

that Kristin could either attend Children's Center or have homebound services. (TR 417, 565, 741-

742, 770-772). Kirkland admitted that she had no professional basis with which to disagree with any

21

of Dr. Vogtle's conclusions. (TR 1503). Further, it is unclear how the District made its decision that Kristin could not receive services in the Vaughn Road program, especially given that some of the IEP participants had essentially no knowledge of Kristin's needs or the content of her program at the Center. (TR 926-927, 1544-1545).[16]  While the District states it based its decision on "health concerns," the persons making the decision did so without the benefit of input from a physician or someone with a medical background.  (TR 913-914, 1529-1532, 1543). Difficulties with that IEP are consistent with the previously stated concerns. Further, the number or hours of educational services offered to Kristin in a homebound program have been, and are, minimal.

### K.    Kristin's Physicians Support Kristin's Placement in a Typical School.

Kristin's physician have never restricted Kristin from attending a regular school. Nor, have they stated that Kristin should avoid activities in the general population or contact with typical children. (TR 508, 1270-1271).  None of Kristin's doctors have recommended that she attend school where there is more than one nurse and the District never questioned Kristin's doctors relative to their opinion on this issue, as the District never contacted Kristin's physician regarding any health concerns.  (TR 772, 1552, 2180-2181).  When directly asked, Dr. Makris, Kristin's respiratory physician, stated that so long as there was someone at school who could respond to Kristin's health needs, there is no reason that Kristin could not attend a special education classroom in a regular education school where she could receive some mainstreaming.  (TR 2360-2361).  Dr. Makris also thought Ms. Ingram to be a good judge as to Kristin's ability to tolerate various environments.  (TR 2362).  The District's nurses

---

[16]Originally, Kirkland informed Ms. Ingram that Kristin could attend the Vaughn Road program. Kirkland withdrew the offer the week before school started in August, 2005.  (TR 564, 738-741).

admitted they would defer to Kristin's doctor as to her needs. (TR 892-893, 1285-1288). Further,

according to the District, it has the ability to provide appropriate nursing services throughout the system

and there is no reason why the District could not place a second nurse at Vaughn Road. (TR 894).

The District never provided specialized training as to Kristin's needs, to any of its nurses, at either the

Center or at Vaughn; and, the nurses at the Center did not remain with Kristin all day in Cartwright's

room.

Kristin's parents want her to attend the program at a typical school, based on Vogtle's and

Locke's recommendations, because it will expose her to students without disabilities, which she enjoys

and from which she benefits. (TR 767-768, 898, 2288-2289). Further, the school teaches academics

and is a more stimulating environment. (TR 2333).

## II.     THE DISTRICT FAILED TO COMPREHENSIVELY EVALUATE KRISTIN.

### A.     Kristin is Entitled to a Comprehensive Evaluation of her Disabilities.

IDEA requires that each student be comprehensively evaluated in all areas of suspected

disabilities. Ala. Rule 280-8-9-.02(1) and 280-8-9-.2(5). A student must also be reevaluated at least

once every three years, or more often if conditions warrant. 42 U.S.C. 1414(a)(2) "Evaluation" is

defined as procedures which are used to determine whether a student has a disability and, if so, the

nature and extent of her need for special education and related services. 34 CFR 300.500(b)(2).[17]

Eligibility for special education related services may not be determined based on a medical diagnosis.

34 CRF 300.532, .533, .535. The term "reevaluation" generally means a comprehensive evaluation

_____

[17]Reference to the 1999 Regulation implementing IDEA is made because, for the most part, those
regulations were controlling with regard to persons' entitlements under IDEA.

23

which is analogous to initial evaluation under 34 CFR 300.532. *See Letter to Tinsley*, 26 IDELR

1076 (OSEP 1990).

In assessing Kristin's needs, the District must ascertain Kristin's present level of performance,

her educational needs and whether additions or modifications in her educational program and related

services are needed to enable Kristin to progress, to the extent appropriate, in the general curriculum.

*See 34 C.F.R.* 300.533(a)(2). In addition, for a student with impaired sensory, manual or speaking

skills, the District must select tests which measure accurately reflects Kristin's aptitude or achievement

level, rather than reflecting Kristin's impaired sensory, manual or speaking skills (unless those skills are

the factors that the test purports to measure). 34 CFR 300.532(e). Kristin must be assessed in all

areas of suspected disability. 34 CFR 300.532(g). MPS was required to use assessments which

provide relevant information that directly assists it in determining Kristin's educational needs. 34 CFR

300.532(j). Finally, MPS must review evaluation data to determine whether any additional

assessments are needed to identify Kristin's present level of performance, whether any additions or

modifications to the special education programs and related services are need to enable Kristin to meet

her goals and to participate, as appropriate, in the general curriculum. 34 CFR 300.533.

**B.    The District Failed to Comprehensively Evaluate Kristin.**

It is undisputed that Kristin has extensive physical impairments. These impairments limit her in

almost every domain. Kristin is completely dependent upon others for essentially all of her needs,

including her basic communication needs. She needs others to reposition her, even slightly. Despite

Kristin's extreme physical limitations, however, Kristin may not be cognitively impaired. Kristin is

extremely responsive and she may be able to learn a number of academic skills, as well as how to

24

control her environment, albeit largely through the use of technology.

Despite Kristin's needs and her unknown potential, the District has failed to conduct even the most basic assessment of Kristin's capabilities. To date, MPS has failed to evaluate Kristin's cognitive abilities or her level of academic achievement. It, too, has failed to obtain an assistive technology evaluation, including an evaluation of Kristin's ability to utilize switches and mounts. MPS failed to complete formal occupational[18] or physical therapy assessments. The only speech and language assessment secured by the District was completed by Dr. Denise Gibbs in May 2001. MPS has failed to conduct any follow up evaluation. While it is true that the District had some anecdotal information relative to some of Kristin's needs, such does not substitute for a thorough assessment of Kristin's multiple needs. Rather, the District has been content to sit idly by and apparently assume that due to Kristin's significant physical limitations, Kristin will never be able to do more than occasionally activate a switch, smile and giggle and otherwise be entertained by her teacher. Given Kristin's significant physical limitations, coupled with the fact that she well may be a "typical" student, it is hard to imagine how the District's failure to evaluate Kristin could be any more egregious.

The District has also failed to draw on information from a variety of sources. And, since it failed to evaluate Kristin, it has failed to appropriately select evaluations which do not simply measure Kristin's impaired sensory, manual or speaking skills deficits. 34 CFR 300.532, .533. *Bonadonna v. Cooperman*, 619 F.Supp. 401 (N.D. NJ 1985) (school district's evaluation of a hearing impaired student predominantly by teacher observation, without employing a specialized test or specially trained

---

[18]Of course, Vogtle's evaluation was an occupational therapy assessment, but it was secured by Petitioners.

25

personnel, as well its resulting IEP were invalid); *Babb v. Knox County School System*, 965 F.2d 104

(6th Cir. 1992) (failure to complete full evaluation violates IDEA); *Blackmon v. Springfield R-XII Sch.*

*Dist.*, 29 IDELR 855 (W.D. Mo. 1988).

The District's identification of Kristin as eligible for special education services under the

category of "multiple disabilities" highlights problems arising from the District's failure to properly

evaluate Kristin. First, the District did not even conduct the basic assessments necessary to properly

classify Kristin under that category. Further, the lack of evaluations made it impossible to determine the

existence and/or severity of Kristin's other needs.

Under state law, multiple disabilities is defined as:

concomitant impairments (such as mental retardation-blindness, mental retardation-orthopaedic
impairment, etc.) the combination of which causes such severe educational needs that they can
not be accommodated in special education programs solely for one of the impairments.

290-8-9-.03(7)(a). To be deemed eligible, the student must meet all eligibility criteria for two or more

areas of disabilities, as defined by IDEA, based on the specific evaluations which are required under

each area of disability.

In the instant case, it is difficult to know what "two or more" areas of disabilities the District

believed Kristin met to be eligible for special education services. One of the disabilities likely would

include an orthopaedic impairment. At a minimum, the specific evaluations required for that category

would include a medical diagnosis and "performance measure" such as a developmental score, an

individual intelligence score, an academic achievement measurement, classroom observation, motor

assessments and criteria-referenced tests or curriculum based assessments. Ala. Code 290-8-9-

.03(7). In this case, however, the District failed to secure much more than a medical diagnosis. It

26

never administered an individual intelligence evaluations, educational achievement tests, motor assessments, or other curriculum based assessments. Further, the District admitted that, until the Ingrams secured an attorney, the District took no steps to assure comprehensive evaluations.

It is unclear what the second eligibility criteria Kristin met for her multiple disabilities classification. One could presumably rule out autism, deaf blindness, emotional disturbance, hearing impairment, traumatic brain injury and visual impairment. Further, the District cannot rely on the classification of mental retardation or learning disabilities, inasmuch the District had no idea whether Kristin had either condition.

While it is possible that the District believed that Kristin met the diagnosis of "other health impairment" or "speech and language impairment," the District also failed to complete the evaluations necessary to make determination regarding these classifications. Ala. Rule 290-8-9-.03(9) and (11). Again, the only actual language evaluation completed by the District was Gibbs' May 2001 assessment. However, that evaluation was in May 2001. The District could also have assessed Kristin's abilities utilizing at least criterion referenced assessments which did not discriminate based on her sensory needs; but, it did not.

Finally, MPS should have provided Kristin with a comprehensive assistive technology assessment and occupational and physical therapy evaluations years ago so as to be able to design an augmentative communication system which would allow Kristin to communicate her basic needs. Such communication is critical to the provision of an appropriate education.

The District's failure to assure that Kristin was comprehensively evaluated was not merely a technical defect which had no impact on the provision of educational services to Kristin. Rather, the

27

District's failure deprived MPS of information which was necessary to develop even the most basic

educational program for Kristin.  It is telling that, despite the fact that Kristin was at the end of her

fourth grade year at the time of the hearing, not one person from the District staff knew whether she had

mental retardation.  No one could estimate her potential, including Kristin's potential to perform

academic activities.  MPS had no assessment as to whether Kristin was capable of learning to read at

any level or whether Kristin comprehended what was read to her.  Accordingly, MPS violated Kristin's

rights to comprehensive evaluations under IDEA.

**III.    THE DISTRICT FAILED TO OFFER KRISTIN A FREE APPROPRIATE EDUCATIONAL PROGRAM.**

 **A.    Kristin Is Entitled to Extensive Educational Services under IDEA.**

  Kristin is entitled to an extensive array of educational programs and services under IDEA.

Kristin is entitled to an IEP and an educational placement which meets her unique needs.  She is also

entitled to appropriate related services to include direct and consultative physical and occupational

therapy, speech and language services and training to her parents.  Kristin is entitled to assistive

technology which is designed to allow her to function as independently as possible.  When Kristin was

absent from school due to her surgeries or health issues, she was entitled to a homebound educational

program offered via an IEP which meets IDEA's requirements.  Finally, Kristin is entitled to the

provision of nursing services so as to enable her to be educated in an environment which includes

regular education students as much as possible.  As will be demonstrated, however, MPS violated

Kristin's rights by failing to provide the above services and educational placement.

 **B.    Kristin is entitled to an IEP which meets her unique needs.**

To be eligible for Federal financial services under IDEA, a state must assure that "all children with disabilities who are between ages three and twenty-one receive a FAPE." 34 CFR 300.122, 300.220. No child is too severely impaired to be entitled to educational services under IDEA. IDEA's entitlements extend to **all** students with disabilities and a "zero reject policy" is inherent within the statute. *Timothy W. v. Rochester, N.H. School District*, 875 F.2d 954 (1st Cir., 1989) (*cert. denied*) 493 U.S. 983 (1989); *Honig v. Doe*, 484 U.S. 305 (1988).

IDEA defines "free appropriate public education" (FAPE) as "special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." 20 U.S.C. § 1401(18).

Special education is also broadly defined to include:

> ...specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including-
> (i) Instruction conducted in the **classroom, in the home**, in hospitals and institutions, and in other settings; and
> (ii) Instruction in physical education.

34 CFR 300.26 (emphasis added).

One of the hallmarks of IDEA is its requirement that each student have in place an individualize education plan (IEP) to meet their unique needs. The IEP must be in effect at the beginning of each school year. 34 CFR 300.341.

An IEP must contain a statement of the child's present level of educational performance,

including how the child's disability affects her involvement and progress in the general curriculum.  It

must also contain a statement of measurable annual goals and short term objectives which relate to the

child's needs, so as to enable the child to be involved in and progress in the general curriculum,

including in academic and non-academic areas.  The material shall be written in objective terms to the

extent possible, based on the student's evaluations.  Deficiencies in a student's present level of

performance should be addressed by the goals and objectives, along with the provision of special

education services. *Special Education Law and Treaties*, 2nd Ed. Mark Webber, LRP, 2002; *see*

*also Independent School Dist. No. 701 v. J.T.*, 45 IDELR 92 (D. Mn., 2006) (finding IEP goals

which failed to address a student's basic academic needs, inadequate).  An IEP must expressly state

the special education and related services which are to be provided to the child which will allow the

child to advance appropriately towards her annual goals, and which will allow the child to be involved in

and progress in the general curriculum.  34 CFR 300.347.

Revisions of a student's IEP must occur periodically, but not less than annually, to determine

whether a student's annual goals are being achieved.  Thus, a district has an **obligation** to revise a

student's IEP to address –

(i)    **any lack of expected progress toward the annual goals** described in Section 300.347(a), and in the general curriculum, if appropriate;

(ii)    the results of any reevaluation conducted under Section 300.536;

(iii)    information about the child provided to, or by, the parents as described in Section 300.533(a)(1);

(iv)    **of the child's anticipated needs**; or

(v)    **other matters**.

34 CFR 300.543 (emphasis added). Significantly, IDEA's requirement that a student's IEP contain a statement of her present level of performance and objective evaluation criteria are more than technical requirements. Without an indication of how the student is performing at the time an IEP is drafted, it is impossible to determine progress. *Cleveland Heights - University Heights City School Dist. v. Boss*, 144 F.3d 391 (6th Cir. 1998). An IEP team must include, *inter alia*, a representative of the district who is knowledgeable about the general curriculum; and, an individual who can interpret the instructional implications of evaluation results. 34 CFR 300.544.

**If a district is unable to implement a student's IEP, then it must revise the IEP to assure that the child receives appropriate services.** *Todd v. Andrews*, 933 F.2d 1576 (11th Cir. 1991); *Kattan v. District of Columbia*, 691 F.Supp. 1539 (D.C. Cir. 1988); *Manalansan v. Bd. of Educ. of Baltimore City*, 35 IDELR 122 (D.C. Maryland 2001).

    **C.**    **The District had/has a responsibility to provide Kristin with related services, including speech and language, physical and occupational therapy, school health services and parent training.**

    **IDEA defines "related services" expansively to include:**

[T]ransportation, and such development, corrective, and other supportive services (including **speech-language pathology** and audiology services, psychological services, **physical and occupational therapy**, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation services only (as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C.A. §1401(a)(17) (West Supp. 1991) (emphasis added). Parent training is also a related

31

service. 34 CFR 300.24.

Physical or occupational therapy services may assist a child benefit from his/her educational program because it redressed physical disabilities which interfere with the development of other skills that are essential to education. The services themselves may "form the core" of the education program for a child with a severe disability. *Polk v. Central Susquehanna Intermediate Unit 16*, IDELR 441:130 (3rd Cir. 1998). The amount of the related service must be stated in the IEP, so that all parties are clear regarding the district's commitment. *See,* Question 35 of Appendix A, to the 1997 Regulations.

School health services are related services under IDEA. In 1984, the United States Supreme Court interpreted a district's duty to provide health services under IDEA. *Irving Independent School District v. Tatro*, 468 U.S. 883, 104 S.Ct. 3371 (1984). In *Tatro*, the child required clean intermittent catheterization (CIC) in order to attend school. The district contended that the service was excluded as a medical service. The Court disagreed, reasoning that the service is a "school health service," because it was provided by a school nurse. Thus, nursing services are related services under IDEA. It was not controlling that the service required a prescription or the person responsible for providing the service ultimately may be under the supervision of a physician. Finding the student needed nursing services to attend school, the Court Ordered the provision of such.

Subsequent to *Tatro*, a line of cases departed from its holding to apply a so-called "multi factor" test which considered the nature and extent of the services at issue. *See Detsel v. Auburn*, 637 F.Supp. 1022 (N.D.N.Y. 1986); *Bevin H. v. Wright*, 666 F.Supp. 71, IDELR 559:122 (W.D. Pa. 1987). **In 1999, however, the U.S. Supreme Court reaffirmed *Tatro*'s "bright line" test in**

32

*Cedar Rapids Kennedy School District v. Garet F.*, **29 IDELR 966 (U.S. 1999) to hold that nursing services are related services which must be provided, if they are necessary to enable the student to attend school. Notably, there is nothing in the decision which limits such services to a segregated environment.**

Garet involved a student who had a motorcycle accident which paralyzed him from his neck down. The student's cognitive abilities, however, remained intact. He was able to speak and to control his motorized wheelchair through a "puff and suck straw." However, Garet was dependant on a ventilator, which necessitated the presence of a nurse during the time that Garet attended school. Garet also required, *inter alia*, catheterization, suctioning of his tracheotomy, and blood pressure monitoring. Believing that the services were more medical in nature, the District refused to provide them.

In an analysis closely resembling its decision in *Tatro*, the Supreme Court found that the services were "supportive services," inasmuch as they were necessary for Garet to attend school. Since the services did not need to be provided by a physician, they were the District's responsibility. The Court also rejected the "multi-factor" test stating that:

> The proposed factors can be found neither in the text of the statute nor the regulations that were upheld in <u>Tatro</u>. Moreover, the District offers no explanation why these characteristics make one service any more medical than another. <u>Id</u>. at 968.

Finally, the Court also found it significant that "it is undisputed that the services at issue must be provided if Garet is to remain in school.:" <u>Id</u>. at 969. Notably, *Garet* received all of his educational services in a regular education class.

**D.      The District has a Duty to Provide Kristin with Assistive Technology Devices**

33

**and Services which Meet her Needs.**

IDEA requires each public agency to insure that either assistive technology devices or assistive technology services, or both, are made available to a child with a disability, if such is required as part of the child's special education, related services, or supplementary aids and services. 34 C.F.R. § 300.308.[19]

IDEA defines the term "assistive technology device" as:

> any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of a child with a disability. 20 U.S.C. § 1401(1); 34 C.F.R. § 300.5.

"Assistive technology service" includes "any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device." This term includes:

> (a) **the evaluation of the needs of such child, including a functional evaluation of the individual in the child in the child's customary environment;**
>
> (b) **purchasing, leasing, or otherwise providing for the acquisition of assistive technology devices by such child;**
>
> (c) selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or replacing of assistive technology devices;
>
> (d) coordinating and using other therapies, interventions, or services with assistive technology devices, such as those associated with existing education and rehabilitation plans and programs;

---

[19] An appropriate needed technological device or service can be characterized as "education," a supportive "related service," or a "supplemental service," which is needed to enable a child to participate in regular education opportunities with non-handicapped peers.

(e) **training or technical assistance for such child, or, where appropriate, the family of such child**; and

(f) **training or technical assistance for professionals (including individuals providing education and rehabilitation services), employers, or other individuals who provide services to, employ, or are otherwise substantially involved in the major life functions of such child**. 20 U.S.C. § 1401(2); 34 C.F.R. § 300.6. (emphasis added).

IDEA requires each public agency to insure that assistive technology devices or services are made available to a child with a disability if such is required as part of the child's special education, related services, or supplementary aids and services. This decision is to be made by the IEP committee. If the IEP committee finds in favor of a device or service, then the specific technology device or service must be identified in the child's IEP. *Letter to Anonymous*, 24 IDELR 854 (OSEP 1996).

IDEA does not contain a predetermined listing of assistive technology devices and/or services. Rather, each situation is to be determined on a case by case basis. In other words, the IEP team must conduct an analysis regarding what types of devices and services are needed in light of that specific child's educational needs. *Letter to Naon*, 22 IDELR 888 (OSEP 1995). However, several decisions have found that an augmentative communication device is a form of assistive technology and a district must provide an evaluation to determine the necessity of such device. *In re Child with a Disability*, 21 IDELR 749 (SEA 1994). Further, a district may be responsible for providing a specific type of communication device. *Greenwood County Sch. Dist. No. 52*, 19 IDELR 355 (SEA 1992) (a school district was obligated to provide a student with multiple disabilities access to "The Liberator" in order to meet her communications need, as another device was too limited.). In some circumstances,

35

a student may also be allowed to take and use the device in other settings, such as the child's home. In these cases, a determination must be made as to whether such is required to provide a FAPE. *Letter to Culbreath*, 25 IDELR 1212 (OSEP, 1997). *See also Letter to Anonymous*, 18 IDELR 627 (OSEP 1991).

A district is required to invite professionals who are trained how to utilize an assistive technology device to the IEP meeting. *Colton Joint (CA) Unified Sch. Dist.*, 22 IDELR 895 (OCR 1995).

> **E.    Kristin Is Entitled To An Educational Program Which Provides Her With A Combination Of the Services Identified Above and Which Offers More Than Trivial Benefit.**

In 1992, the U.S. Supreme Court provided guidance for determining whether a student is receiving a free appropriate public education (FAPE). *See Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982). Under *Rowley* a Court's first inquiry must be whether a district has offered the due process procedures mandated by IDEA. The second is whether the student's IEP is reasonably calculated to enable the child to receive an educational benefit. Subsequent to *Rowley*, however, other courts have had the opportunity to determine the meaning of "educational benefit." Several of those Courts have determined that the provision of a benefit which is trivial or *de minimus* does **not** constitute a free appropriate public education.

One of the first cases to deal with this issue as it relates to students with severe disabilities is *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3d Cir.1988). Christopher Polk was a 14-year-old who required a program designed to teach him basic skills necessary for daily living. Christopher's parents sought the provision of direct physical therapy, rather than consultative

physical therapy as offered by the District.  With the direct physical therapy, Christopher made

meaningful progress.  However, Christopher's parents also agreed that Christopher made some

progress with the provision of consultative therapy.

Relying on *Rowley*, the District asserted that it was only required to offer consultative physical

therapy, and that it had the ability to choose the type of educational program provided to Christopher.

The District also argued that, since Christopher was severely disabled, slow progress was to be

expected.  Since Christopher had made some progress under the consultative model, the District

argued that it had met its obligation to Christopher.  The Third Circuit rejected the District's argument.

Most significantly, **the Court rejected *Rowley* as the measurement as to whether the**

**District provided Christopher with a FAPE.  *Rowley* involved a bright, eight-year-old student**

**who had easily progressed from grade to grade in a regular education setting.**  Further, in

*Rowley*, the school had made "substantial efforts" to educate the student, including providing her with a

phonetic ear and speech therapy.  And, several administrators had also attempted to learn sign language

in order to assist the child.  Explaining that *Rowley* did not "espous(e) an entirely toothless standard of

substantive review."  *Id.* at p. 179.  The Court stated:

> [N]otwithstanding *Rowley's* broad language, the Court indicated that **its holding
> might not cover every case brought under the EHA.** Indeed, *Rowley* was **an
> avowedly narrow opinion that relied significantly on the fact that Amy Rowley
> progressed successfully from grade to grade in a mainstreamed classroom.**  *Id.*
> at 179-180. (emphasis added)

IDEA requires more than a *de minimus* or "some benefit," and, the fact that Christopher had received

**some** benefit from consultative physical therapy, did not mean that Christopher received an appropriate

public education.

IDEA's legislative history supports this holding. Congress placed an emphasis on providing educational program which is designed to enable a student to obtain some degree of self-sufficiency. Indeed, **the legislative intent of IDEA was focused largely on educating students with severe disabilities, as these students were thought to be the students who were most entitled to services**. As explained in *Polk*:

> must have envisioned that **significant learning would transpire in the special education classroom** – – enough so that citizens who otherwise become burdens on the state would be transformed into productive members of society.
>
> **Indeed, the needs of children like Christopher were paramount in the eyes of the EHA sponsors.** (The EHA provides that the most severely handicapped children be served first.) *See*,20 U.S.C. 1412(3). **That Christopher may never achieve the goals set in traditional classrooms does not undermine the fact that his brand of education (training in basic life skills) is an essential part of EHA's mandate.**

*Id.* at 182-183. (emphasis added)

Thus, the Court held that:

> just as Congress did not write a blank check, neither did it anticipate that states would engage in the idle gesture of providing special education designed to confer only trivial benefit. Put differently, and using *Rowley's* own terminology, we hold that Congress intended to afford children with special needs an education that would confer meaningful educational benefit.

*Id.* at 184.

In *Chris D. v. Montgomery County Board of Education*, 753 F.Supp. 922 (M.D. Ala. 1990), the Court adopted the reasoning in *Polk* to find that a child had not received a FAPE because, despite the District's program, the student had achieved little academically. Further, the student was never meaningfully reevaluated, and achievement tests showed that he had not made substantial academic progress and had actually regressed. In defending its program, the District argued that Chris

38

had learned some things while in the District's program and, thus, that its program was appropriate under *Rowley*.

The Court disagreed. IDEA requires that a student's IEP be designed to produce meaningful and measurable progress, not regression or trivial educational advancement. IDEA, entitles a student to "personalized instruction with sufficient support services to permit the child to benefit educationally." In addition, the Court found that the student's teachers lacked significant expertise regarding Cory's individual needs. Addressing the school's argument that it had offered Cory a free appropriate public education, the Court stated:

> The court cannot agree that since Cory has learned **something** in the last several years, he is therefore receiving an educational benefit from special education. These test results indicate that he would be in the same position he is now if he had never received any special education. Indeed, children could learn **something** over the course of time simply from existing and watching television, even if they never attend a day of school under the Act. An educational benefit is not conferred anytime a student is not left to vegetate. The Court agrees with the Third Circuit [in *Polk*] that the EHA cannot be so trivialized. The Act requires a plan under which educational **progress** is likely. The Act requires a plan to produce progress, not regression or trivial educational advancement. The "some-educational-benefit standard does not mean that the requirements of the Act are satisfied so long as a handicapped child's progress is not brought to a virtual standstill."

*Id.* at 931. (emphasis in the original)

Many other Courts have, too, held that educational programs which are not designed to offer a student with a meaningful opportunity to reasonably progress do not meet the standard under the DIEA. In *Evans v. Bd. of Educ. of the Rhinebeck Central School District*, 930 F. Supp. 83 (S.D.N.Y. 1996) (a District had failed to offer a free appropriate public education based on the testimony of numerous expert witnesses who **were not sufficiently trained to provide a FAPE.**). In

39

*Board of Educ. of the County of Kanawha v. Michael M.*, 95 F. Supp. 2d 600 (S.D. W.V., 2000),

(a school had failed to offer an eight-year-old child with autism and severe speech and language

disorders a free and appropriate public education), because, *inter alia*, the **District had only**

**presented its own staffs' testimony that the school's program was appropriate.** Moreover, **the**

**District had failed to demonstrate that the child functioned as could be reasonably expected).**

*Adams by Adams v. Hansen*, 632 F. Supp. 858 (N.D. Cal. 1985) **(the court was critical of the**

**District's witness, lacking familiarity with a wide variety of instruction strategies.**); *Strabue v.*

*Florida Union Free School Dist.*, 801 F. Supp. 1164 (S.D.N.Y. 1992) (a District denied FAPE to a

student by implementing an IEP similar to those in previous years.). *T.H. v. Bd. of Educ. of Palatine*

*Community Consolidated School District 15*, 55 F.Supp.2d 830 (N.D. Ill. 1999) (the **District was**

**unable to "articulate what its proposed methodology was."**) *Johnson v. Lancaster-Lebanon*

*Intermediate Unit 13, Lancaster City School Dist.*, 757 F. Supp. 606 (E.D.Pa. 1991) (The court

also rejected *Rowley* as inapplicable and credited the parents' witness over the District's staff, who

essentially just defended the District's program).

**F.     Since at Least April 2003, the MPS Has Denied Kristin a FAPE.**

Since at least April 2003, Kristin's educational program has been extremely deficient in a

number of areas, resulting in a denial of a FAPE.

In part, likely because the District failed to comprehensively evaluate Kristin, the District has

repeatedly failed to design and implement IEPs for Kristin which met IDEA's requirements. MPS

failed to provide Kristin with related services in a manner and amount which was designed to meet

Kristin's unique needs. It also failed to provide an assistive technology evaluation, services and

40

equipment to Kristin so as to increase her functional capabilities. The District violated IDEA by failing to revise Kristin's IEP to offer homebound services when it became clear the Kristin's disabilities caused her to be absent from school, which further impeded her progress. Finally, the District's program was not provided in the least restrictive environment. These critical deficiencies, either taken individually or when combined, denied Kristin meaningful education services under IDEA. Kristin has not only failed to grow, she has regressed in a number of areas. Thus, Kristin is entitled to compensatory education.

Beginning in at least 2002, and continuing, the District's IEPs failed to meet IDEA's basic requirements. The IEPs often have failed to state Kristin's present level of performance in conjunction with Kristin's goals; and, according to Locke, Kristin's goals and objectives were too broad and difficult to measure. (See, generally, the testimony of Locke). The IEPs, consistently failed to state how Kristin's disability would effect her involvement and progress in the general environment, and they failed to identify the special education related services which would enable Kristin to be involved in and progress in the general curriculum. At least two of the IEPs include the statement that Kristin will be provided certain services, such as an opportunity to activate switches, **if** the staff had time to perform this activity. Kristin's goals and objectives were continued year after year, despite the fact that Kristin had either mastered many of these skills earlier in life or the goals were otherwise inappropriate for her. According to Locke, MPS failed to effectively measure Kristin's program, or lack thereof.. MPS did not include an individual who was knowledgeable about Kristin's condition at Kristin's IEP meetings and MPS failed to assure that Cartwright was trained to meet Kristin's needs.

Kristin's IEPs were also deficient in that the District failed to secure an assistive technology

41

evaluation and the necessary assistive technology services and equipment to enable Kristin to increase

her functional capacities to communicate and acquire daily living, socialization and academic skills.

MPS's utilization of technology in Kristin's program was minimal and not infused throughout her day.

According to Vogtle and Locke, Kristin has had an urgent need over the past several years for an

assistive evaluation and appropriate technology, especially in the area of augmentative communication.

This technology is critical to enable Kristin to socialize, to communicate her needs and to demonstrate

her potential, as the development of Kristin's expressive and receptive communication abilities are

prerequisites to acquisition of most other skills.    According to Vogtle, the selection of An appropriate

communication system is not a simple matter of trial and error.  Rather, Kristin's ability to activate

switches requires an assessment of her range of motion and other physical abilities.  A careful analysis

of a variety of factors such as Kristin's motivation and her fatigue level must occur.  It is important to

select several switch activation sites so as to allow good use of the technology.  A detailed data

collection must occur to appropriately select switches and mounts to meet Kristin's needs.

Accordingly, the  District should have sought the expertise of a professional who was capable

of identifying Kristin's need for technology, rather that rely on Cartwright, who has little knowledge in

these areas.  Kristin's program in Cartwright's room was devoid of appropriate technology and it

offered Kristin minimal opportunities to acquire communication and other skills.  As Vogtle explained,

the room contained few mounts and students were forced to wait their turn to activate a switch.  While

in Cartwright's room Kristin typically either was "entertained" by Cartwright or she languished on a

mat, in her wheelchair or in a "Lazy Boy" recliner, without engaging in either socialization, academic or

functional activities.  Cartwright had neither the training nor the skills to appropriately assess Kristin's

42

educational abilities, and she did not how to teach Kristin to use the switches and/or communication

devices. Both Locke and Vogtle had additional criticisms of Kristin's program and referenced is made

to their testimony.

Vogtle, Locke and Prim all testified that Kristin had untapped potential and that she was

capable of performing at a much higher level. Most children with Kristin's condition have normal

intelligence and Locke and Vogtle both perceived Kristin as very responsive.  Kristin has already

mastered cause and effect.  Thus, it is reasonable to expect that with adaptive technology and an

appropriate educational program, Kristin eventually be able to successfully perform at her grade level.

In any event, Kristin should be performing at a much higher level in a number of areas.

The District's failure to offer Kristin an appropriate education is further demonstrated by the

District's failure to implement Dr. Gibb's May 2001 speech and language assessment of Kristin.  Gibbs

recommended that the District secure an assistive technology evaluation and that it infuse the use of

communication opportunities throughout Kristin's day.  Other than to implement the oral motor

stimulation, the District failed to comply with Gibbs' recommendations.  Even after Dr. Gibbs explained

Kristin's need for an assistive technology assessment, the District failed to assure an evaluation.

Instead, MPS secured only an informal consultation with a consultant who apparently did not even

observe Kristin.

Since the MPS failed to offer Kristin a FAPE, to include the appropriate use of assistive

technology, she is entitled to compensatory education. *East Penn. Sch. Dist. B.*, 29 IDELR 1058 (E.

D. Penn. 1999); Aff'd. 213 Fd. 3d. 628 (3d Cir. 2000) (Third Circuit affirmed an award of two years

of compensatory education to a student when the district failed to assure appropriate assistive

43

technology and services. The assistive technology device was did not assist the student and the district took too long to provide the device); *School Bd. of Independent School District No. 11 v. Pachl*, 36 IDELR 263 (D.C. Minn. 2002) (the district's delay in providing assistive technology denied an appropriate education for a student who had very little ability to communicate and supported an award of compensatory education); *Kevin T. v. Elmhurst Community School Dist.*, 36 IDELR 153 (N.D. Ill. 2002) (a district's failure to evaluate a student's need for assistive technology entitled the student to compensatory education.). *See also Jessie v. Bullitt County Board of Education*, 43 IDELR 112 (W.D. Ky. 2005).

In addition, the District failed to provide related services to include direct occupational and physical therapy, as well as speech and language services in a manner and amount reasonably designed to enable Kristin to learn and grow. Despite that Kristin can only move her head some and her hands slightly, the District completely failed to meaningfully offer occupational and physical therapy services. Although Kirsten could barely communicate, MPS offered her only minimal speech and language services. According to Vogtle and Locke, Kirsten should have been provided such services at a greater frequency and intensity.

The District's failure to provide Kristin with a FAPE is similar to that described in *Independent School Dist. # 112*, 4ECL PR 314 (Min. SEA 2001), wherein a hearing officer found that a student with arthrogriposis had been denied FAPE due, *inter alia*, to the district's failure to assure services which would allow the student's communication abilities to progress. As the hearing officer recognized, it is critical that a school provide children with meaningful services in a timely manner:

44

**Children won't wait forever for abilities to be developed. They're very dependent on adults with whom they work to achieve these abilities, and if a period of time, or months, in some cases, years go by and progress is very slow, the child senses that. And then comes to the conclusion in his own way that this is simply not worth the effort and the child withdraws. Opportunities with children could be lost forever.**

Finally, MPS cannot realistically assert that its failure to offer Kristin services has had no effect. The District has offered essentially no evidence that Kristin has progressed over the past few years. Cartwright admitted that Kristin only mastered one goal. And both Petitioners, as well as Locke testified that over the last few years Kristin has actually regressed.

## IV.    KRISTIN HAS THE RIGHT TO AN EDUCATIONAL PROGRAM IN THE LEAST RESTRICTIVE ENVIRONMENT.

### A.    Kristin has the Right to Placement in the Least Restrictive Environment.

In enacting IDEA, Congress indicated a clear statutory preference for educating students with students without disabilities to the maximum extent appropriate. 20 U.S.C. § 1412(5) discusses eligibility requirements for states to receive federal funds, and it so **provides that each state must have established**:

> Procedures to assure that to the maximum extent appropriate, children with disabilities including children in public or private institutions or other care facilities, are educated with **children who are not disabled**, and that special classes, separate schooling, or the removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

A district must assume the provision of supplementary services in conjunction with any placement in a more typical education environment. 34 C.F.R. 300.550, *et. seq.* Placements must be made by a group of persons, including the parents and other persons with knowledge about the child, along with the meaningful evaluation data and placement options. **A child must not be removed from**

**a typical education program solely because of any needed modifications in the typical**

**environment.** 34 C.F.R, 300.552, 34 C.F.R., 300.553 and 34 C.F.R., 300.554.[20] In Alabama, for a

student Kristin's age, placement in a homebound program is extremely restrictive. Ala. Rule 290-8-9-

.6(3).

In 1991, the Eleventh Circuit joined with the Third, Fifth and Ninth Circuits, to establish a

standard for determining what constitutes the least restrictive environment. In making such assessment,

one must consider certain factors. The standard articulated in *Rowley* is not applicable to this analysis.

*Greer v. Rome City School District*, 950 F.2d 688 (11th Cir.1991), involved a ten-year-old

student whose parents sought full time placement of their daughter in a regular education classroom,

based, in part, on an independent evaluation which determined that placement in a self-contained

classroom would deprive Christy of appropriate role models and sufficient intellectual stimulation. The

District recommended the placement of Christy in a self-contained classroom.

In reaching its decision, **the Eleventh Circuit held that *Rowley* was not determinative**

**relative to least restrictive environment issues. This is because *Rowley* dealt with the** issue of

what constitutes an appropriate education, **while the least restrictive environment constitutes a**

---

[20]     The Legislative History of IDEA also indicates that Congress envisioned the integration of students,
in part to affect attitudinal changes of persons without disabilities.

> If we allow and, indeed, encourage handicapped children and non-handicapped children
> to be educated together as early as possible, their attitudes toward each other in later life
> will not be such obstacles to overcome. A child who goes to school everyday with another
> child who is committed to a wheelchair will understand far better in later life the limitations
> and abilities of such an individual when he or she is asked to work with, or in a position to
> hire, such an individual.

121 Cong. Rec. 19484 (June 18, 1975) (emphasis added)

**statutory preference for integration**. This point cannot be overstated, and it clarifies that schools cannot place students with significant disabilities in separate programs because separate programs are where the related services are located.

Instead, the Eleventh Circuit Court asked whether the student could be satisfactorily educated in a more regular education type environment with the use of supplemental aids and services? To answer these questions, one should ask, inter *alia*, What steps has the school taken to accommodate the student in a regular education setting? One should also balance the benefits of educating the student in regular education with aids and services with education in the segregated environment? The court noted that **education is not limited to academics, but includes personal skills and other types of growth**. If a student cannot be fully integrated in a typical class, then she should be included in a regular environment to the maximum extent appropriate. *See also A.S. v. Norwalk Board of Education*, 184 F. Supp 2d, 534 D. Conn., 2002) (rejecting *Rowley* as applicable to LRE issues).

Significantly, an interrelationship exists between a student's right to related services and her right to the least restrictive environment. A district must provide all related services which would otherwise make a segregated school necessary. For example, it would be contrary to the least restrictive environment mandate for a district to concentrate its nursing services in a separate school building and then justify the placement of a child in that building. Several courts have ordered a district to provide a related service in a regular education environment so as to allow the student an opportunity to receive educational services with students without disabilities. *See Special Education Law and Treaties, 2nd Ed.*, Mark C. Weber, Sect. 9.3; *Wilcott v. State Bd. of Educ.*, 1984-85 EHLR 556: 183 (Mich. App. 1984) (court required district to provide cued speech interpreter to allow a child

47

mainstreaming opportunities); *In Re: Dixie Sch. Dist.*, 1982-83 EHLR 504: 274 (Cal. Sea. 1983);

*Tokar Cik v. Forrest Hills Sch. Dist.*, 665 F.2d 443 (3rd Cir. 1981) *cert. denied*, 458 U.S. 1121

(1982) ( school was required to provide CIC in order to allow a child to attend class); *Espino v.*

*Besteiro*, 520 F.Supp. 905 (S.D. Tx. 1981) (ordering that whole classroom be air conditioned rather

than have student placed in an air conditioned box); *Cambpell v. Talladega Cty Bd. of Educ.*, 518

F.Supp. 47 (N.D. Ala. 1981) (rejecting district's argument that student should be sent to a separate

school and required extensive services to be provided to child in general population); *Blount v.*

*Lancaster-Lebanon Intermediate Unit*, 40 IDELR 62 (E.D. Penn. 2003) (court ordered district

consider supplemental aides and services).

**B.    The District has Failed to Provide Kristin with A FAPE In the Least Restrictive
Environment.**

The District has failed, and is continuing to fail, to provide Kristin with a FAPE in the least

restrictive environment.

At the onset it is important to note that Petitioners are not seeking a full-time placement in a

regular education class. Rather, Petitioners are requesting that Kristin attend a special education class

in a typical school with the provision of appropriate related services, to include nursing services,

occupational therapy, physical therapy and speech and language services. Petitioners do, however,

request that Kristin be mainstreamed in accordance with *Greer*.

In placing Kristin at the Center or at home, MPS has ignored the interrelationship between the

provision of related services and Kristin's right to be educated in a least restrictive environment. **The**

**primary reason articulated by the District for placing Kristin in the Center is the**

**concentration of nursing services in that environment**.  However, it is a violation of IDEA for the District to concentrate its related service personal in a particular school and then place a student in that school.  Here, this is exactly the course of action taken by MPS.

Moreover, not one of the District's witnesses were able to, even generally, identify what factors must be considered when determining Kristin's least restrictive environment.  While District staff are not attorneys, it is reasonable to expect that the District's administration staff would have been able to describe even generally some of the factors in *Greer*, as it is binding precedent of the District.  Even worse, an examination of the **District staff's testimony actually demonstrates that the District does exactly what *Greer* warns against**.  Instead of looking at Kristin's individual needs to determine whether Kristin would benefit from contact with students without disabilities, MPS' witnesses testified that they did not even consider placing Kristin in a less restrictive environment.  Rather, because of her disabilities, Kristin "belonged" in the Center.  These "justifications", however fall for short of what is required under the LRE mandate.  **Vaughn School has a full time nurse and the District has acknowledged that there is no reason it could not assign a second nurse to Vaughn**.  Indeed, the District has presented no evidence that it took **any steps** to attempt to accommodate Kristin's needs in a typical school.  And, there is simply **no evidence that the District ever even considered** education in the regular environment for any part of Kristin's day.  This is astonishing, again, given that District staff admitted that there was no reason an additional nurse couldn't be assigned to Kristin.

Finally, and most important, **Petitioners have presented significant evidence that Kristin would benefit from interaction with typical children.**  The uncontroverted testimony of Vogtle and

Locke indicates specific benefits that Kristin would have received, and will receive, if she receives some

education with her non-disabled peers. Petitioners have presented essentially uncontroverted testimony

that Kristin's development, including her communication, academic and socialization skills, are strongly

dependent on her ability to interact with students without disabilities. Locke and Vogtle testified, *inter*

*alia*, that a typical school would provide a far greater opportunity for Kristin to learn, given the

enriched academic environment offered. Even Cartwright admitted that all of Kristin's goals and

objectives could be implemented in a regular school. Thus, Kristin is entitled to receive her educational

program in a typical school.

### V.    MPS FAILED TO REVISE KRISTIN'S IEP TO PROVIDE HER WITH HOMEBOUND SERVICES, IN VIOLATION OF IDEA.

Finally, the District failed to provide a free appropriate public education to Kristin when it failed

to revise her IEP to offer Kristin homebound services during the times Kristin was absent from school

on an extended basis.

As explained, the District has an affirmative obligation to assure that it has offered a FAPE to

**every student who is within the District**. The method for offering a FAPE is through the IEP

process. However, despite that Kristin was absent from school, sometimes for months at a time to

recover from surgery, the District failed to reconvene Kristin's IEP team to offer Kristin homebound

services. Rather, MPS was content to let Kristin stay home without any educational services until April

2005. This is true, despite the District's testimony that Kristin's absences prevented her from

progressing. Pursuant to IDEA, the District had an obligation to revise Kristin's IEP once it became

obvious that her IEP was not being implemented and/or that Kristin was not progressing. Since, for

months at a time, the District offered no educational program, it cannot, as a matter of law, assert that it met its obligation to provide a free appropriate public education to Kristin.

MPS' inaction is especially egregious, given that Kristin has been of mandatory school age since July 2002. According to Alabama law, "every child between the ages of seven and 16 years of age is required to attend a public school, private school, church school or to be instructed by a competent private tutor......"" Ala. Code §§ 16-28-3(2005). ""It shall be the duty of the county superintendent of education . . . to require the attendance officer to investigate all cases of nonenrollment and of nonattendance."" Ala. Code §§ 16-28-16. The School system also has the duty to create a list, prior to the start of each school year, of all students between seven and sixteen who are not exempt from the requirement of attending school and ascertain whether children required to attend school are not enrolled. Ala. Code §§16-28-9; Ala. Code §§ 16-28-11.

To be exempt from the requirement of attending school or of being educated by a private tutor a student must be issued a certificate of exemption by the county superintendent of education. Ala. Code §§ 16-28-6. Prior to issuing the certificate for children suffering from physical a condition/illness preventing their attendance the superintendent ""shall require a certificate from the county health officer in counties which have a health unit, and from a regularly licensed, practicing physician in counties which do not have a health unit, that such a child is physically . . . incapacitated for school work."" *Id.* Here, there is no dispute that Kristin ever sought or received a certificate of exemption.

Petitioners recognize that there is a disputed factual issue as to whether the District orally offered homebound services prior to 2005. However, IDEA does not recognize the existence of an IEP based on a verbal offer of services. An IEP is a written offer of services and the requirements for

51

the drafting and implementation of an IEP are extensive and quite specific. At no point does the federal

or state law recognize the existence of an IEP based on an oral promise. *Burilovich v. Bd. of Educ.*

*of the Lincoln Consolidated Sch.*, 208 F.3d 560 (6th Cir. 2000). Even the Center's own policy

requires the provision of homebound services. MPS readily admits it violated that policy. Further, Mr.

and Ms. Ingram testified that, prior to April 2005, they thought that homebound services meant that

Kristin would sit at home and that they (the parents) would be responsible for her education.

Moreover, Petitioners want Kristin to attend school, as did Kristin's physician, Dr. Makris.[21]

Finally, as a matter of public policy, any assertion that the District should be excused from

offering homebound services via an IEP because Petitioners allegedly rejected MPS' oral offer of

services, should fail. There is no evidence that the Ingrams are negligent parents or that Kristin's

absences were not disability based. An issue of fact exists as to any oral offer prior to 2005. Since the

District openly admits that it failed to convene an IEP to offer homebound services when Kristin was

either too ill or recovering from surgery, MPS is, *per se*, in violation of IDEA. Any other ruling which

would excuse a school from complying with its obligation to provide homebound services in situations

where a student is absent from school due to neglectful parents.

## VI.    FINDINGS, CONCLUSIONS OF LAW AND RELIEF

Accordingly, Petitioners seek an Order which adopts the factual findings and conclusions of law

---

[21]Support for Petitioners' argument on this point is found in both the U.S. Supreme Court and OSEP have determined that a cessation of services for more than ten days constitutes a change in placement. It is undisputed that an IEP must occur when a change in places exists. Indeed, even students who are expelled or denied educational services on a long time basis for behavior which is not a manifestation of their disability are still entitled to a free appropriate public education. Since Kristin was merely ill when she was denied educational services, the District's failure to offer such via an IEP, violated Kristin's rights.

as articulated above. Petitioners, too, seek the following findings of fact and conclusions of law:

1.     MPS has failed to comprehensively evaluate Kristin in violation of IDEA. Kristin is entitled to a comprehensive evaluation of her disabilities.

2.     The District has failed, and is, failing to offer Kristin a free appropriate educational program. Kristin's IEPS have not met IDEA's requirements and the District has failed to provide Kristin with assistive technology and the related services of direct and consultative speech and language services, occupational and physical therapy, nursing services and parent training;

3.     The District has violated, and is violating, its duty to provide Kristin with an assistive technology evaluation and assistive technology devices and services which meet her unique needs, to include equipment and services such as hand splints and an appropriate communication device;

4.     Kristin is entitled to an educational program which provides her with a combination of the services identified above and which offers more than trivial benefit;

5.     The District has failed, and is continuing to fail to provide Kristin with a FAPE in the least restrictive environment.

6.     MPS has failed to revise Kristin's IEP to provide her with homebound services, in violation of IDEA.

Accordingly, Petitioners seek that this Honorable Tribunal Order the following relief:

1.     Comprehensive evaluations in all areas identified above;

2.     A free appropriate public education to Kristin, to include, *inter alia*, all recommendations made by Locke and Vogtle;

3.     Placement of Kristin in a regular school building, preferably Vaughn School, with the

provision of appropriate related services, including a school nurse.  At the school, Kristin may be

placed, for at least part of the day, in a special education classroom and she shall receive mainstreaming

opportunities;

    4.      Related services, to include direct and consultative occupational and physical therapy,

speech and language services and parent training;

    5.      The provision of a comprehensive and assistive technology evaluation and assistive

technology devices and services, including, but not limited, to an augmentative device;

    6.      Two years compensatory education;

    7.      Compensatory damages (Petitioners realize that this Honorable Tribunal does not have

the authority to award compensatory damages);

    8.      Petitioners' reasonable attorney fees;

    9.      A declaration that Petitioners are the prevailing parties.

Dated this the 10th day of July, 2006.

Respectfully Submitted,

s:/DEBORAH. A. MATTISON
DEBORAH A. MATTISON
Attorney for Petitioners

**OF COUNSEL:**
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 19th St. N.
Birmingham, Alabama  35203
(205) 314-0500

xc:    Hearing Officer P. Michael Cole
       Erika Tatum, Esq.

**2**

LAW OFFICES

# WIGGINS, CHILDS, QUINN & PANTAZIS, P.C.

### A PROFESSIONAL CORPORATION

ROBERT L. WIGGINS, JR.
ROBERT F. CHILDS, JR.
A. J. BECK
C. MICHAEL QUINN
DENNIS G. PANTAZIS
TERRILL W. SANDERS
RICHARD J. EBBINGHOUSE
ANN K. WIGGINS
SAMUEL FISHER
ANN C. ROBERTSON
JOSEPH H. CALVIN, III
DEBORAH A. MATTISON
TIMOTHY B. FLEMING*
BYRON R. PERKINS
JON C. GOLDFARB
GREGORY O. WIGGINS
LEE D. WINSTON
ROCCO CALAMUSA, JR.
BRIAN M. CLARK
RUSSELL W. ADAMS

LOUIS SILBERMAN 1889-1976

WILBUR G. SILBERMAN 1919-2003

THE KRESS BUILDING
THREE HUNDRED ONE - NINETEENTH STREET NORTH
BIRMINGHAM, ALABAMA 35203
205-314-0500
205-254-1500 (FAX)

CRAIG L. LOWELL
MAURY S. WEINER
EDWARD McF. JOHNSON
KELL A. SIMON
RODERICK T. COOKS
*LORI KISCH
*ERIC BACHMAN
*HERMAN N. JOHNSON, JR.
TEMPLE D. TRUEBLOOD
AUDREY REITZ CHANNELL
STEVEN L. ATHA
H. WALLACE BLIZZARD
KEVIN W. JENT
JENNIFER WIGGINS SMITH
MINTREL D. MARTIN
SUSAN DONAHUE
BENJAMIN J. DeGWECK
JOSHUA D. WILSON
*HARSIMRAN KAUR DANG
*Not Licensed in Alabama

April 21, 2005

Joseph Morton, Superintendent
Alabama Department of Education
3346 Gordon Persons Bldg.
P.O. Box 302101
Montgomery, AL 36130

RE:     Kristen Ingram v. Montgomery County Board of Education

Dear Dr. Morton:

Please be advised that I, along with Buddy and Marsha Scott, represent Jennie Ingram relative to her daughter, Kristen Ingram. Kristen has been a student at the Children's Center of Montgomery in the Montgomery County school district. She has been certified a eligible for special education services under the category of multiple disabilities.

Please accept this letter as a request for an impartial due process hearing under IDEA, 20 U.S.C. 1415. My clients have significant concerns about the District's current and past failure and/or refusal to assure Kristen comprehensive and timely evaluations, including in the areas of her cognitive ability, self-help skills and assistive technology. In addition, the District's program is segregated and is far too restrictive for this child. The District also has failed to offer appropriate assistive technology devices, including a device in the area of augmentative communication. Although there is no indication within the District's records that Kristen has mental retardation, the District has failed to provide her with any academic services, as well as any program to allow the development of any self-care skills. Finally, while the records are clear that Kristen has been ill for many months at a time over the years, the District has failed to provide Kristen with a homebound program.

BIRMINGHAM - SATELLITE
2017 5TH AVENUE NORTH
BIRMINGHAM, ALABAMA 35203
205-314-0500
205-254-1500 (FAX)

WASHINGTON, D.C.
7 DUPONT CIRCLE N.W. - SUITE 200
WASHINGTON, D.C. 20036
202-467-4123
202-467-4498 (FAX)

LAW OFFICES

## WIGGINS, CHILDS, QUINN & PANTAZIS

A PROFESSIONAL CORPORATION

April 21, 2005
Page 2

This means that Kristen has gone for many months at a time without any educational programming.

Please be advised that, in order to remedy this situation, my client is seeking, *inter alia*, the provision of a free appropriate public education, appropriate evaluations, including reimbursement for independent evaluations at public expense, compensatory education, reimbursement for out-of-pocket expenses, damages and attorney fees.

I look forward to hearing from you relative to how to proceed and thank you for your anticipated assistance.

Very truly yours,

Deborah A. Mattison

DAM/bl
xc:    Ms. Jennie Ingram
       Marsha Scott, Esq.
       Shay Farley, Esq.
       Erika Tatum, Esq.