**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| K. I., by and through | ) |
| her mother and next friend, | ) |
| JENNIE I., and JENNIE I. individually | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO.: |
| MONTGOMERY PUBLIC SCHOOLS, | ) CV 2:06-CV-905-MEF |
| | ) |
|     Defendant. | ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO SUBMIT ADDITIONAL  EVIDENCE**

## I.  INTRODUCTION

Plaintiffs seek to admit supplemental evidence from three experts, Dr. Laura

Vogtle, an occupational therapist, Rochelle West and Donna Locke, speech and

language therapists, each via live testimony.  The admission of this evidence is

consistent with the Eleventh Circuit's decisions in *Walker Co. School District v.*

*Bennett*, 203 F. 3d 1293 (11th Cir. 2000) and *School Board of Collier County Florida*

*v. K.C.* 285 F.3d 977 (11th Cir. 2002).  The evidence is non-cumulative as it concerns

K.I.'s current needs and her progress since the hearing.  It also addresses  and the

appropriateness of K.I.'s current educational program, to include her current

individual education plan (IEP).  This evidence is highly relevant because it will

assist this Court in determining both the merits of plaintiffs' appeal, as well as whether K's continued placement at the Children's Center (the Center) is appropriate.

## II. PLAINTIFFS SOUGHT A DUE PROCESS HEARING UNDER IDEA DUE TO LONGSTANDING PROBLEMS CONCERNING K.I.'S EDUCATION PROGRAM.

Plaintiff K.I. has been enrolled as a special education student in the MPS since at least 1998. She has arthrogryposis and restrictive lung disease. As a result of these conditions, K.I's movements are very restricted. K.I. has limited movement of her head and arms and hands. K.I. cannot speak, although she is cognizant of her surroundings and very responsive. K.I. is fed by a tube.[1] K.I. did not always have such significant disabilities. K.I. spoke until she was two years old. She was fed by mouth until she was four years old. TR 504, 515. It is believed that K.I. may not be significantly cognitively impaired, if at all, as most children with arthrogryposis have normal intelligence. TR 982.

---

[1] K.I.'s condition causes her to have some health issues which need to be addressed during the school day. Sometimes K.I. needs to be "suctioned". However, such health issues do not require placement at the Center. The services can be, and have been, routinely performed by a nurse. Further, K.I. has attended summer school at another location with higher functioning children. Under Supreme Court precedent, nursing services is a related health service which must be provided if it will assist a student with a disability in benefitting from his or her educational program. 34 C.F.R. 300.34. *Irving Independent School District v. Tatro*, 468 U.S. 883, 104 S.Ct. 3371 (1984); *Cedar Rapids Kennedy School District v. Garet F.*, 29 IDELR 966 (U.S. 1999). [IDELR refers to the Individuals with Disabilities Education Law Report, a loose-leaf reporter published by LRP Publications. Cases cited by their IDELR identifications were not available on Westlaw. The numbers following quotes in these cases refer to the page on which the quote appears when the case is printed off the website www.specialedconnection.com.]

This action constitutes an appeal from a due process hearing concerning K.I.'s entitlement to an appropriate educational program in the least restrictive environment as required by the Individuals with Disabilities Education Act, 20 U.S.C. 1400 *et seq.* (IDEA) and Section 504 of the Rehabilitation Act, 29 U.S.C. 796 (§ 504). One of the questions before this Court is whether K.I. should remain at the Center. The Center is a segregated facility which serves only the most severely cognitively and physically disabled children within the MPS District. MPS will only allow K.I. to be educated at the Center or at her home. Another significant question involves the adequacy of MPS' past and current provision of a free appropriate public education (FAPE) to K.I. This question requires an examination of whether MPS has provided – and is now providing – K.I. with adequate assistive technology devices and services.

**A.    IDEA Requires that MPS Provide K.I. with a FAPE, to Include Appropriate Utilization of Assistive Technology.  K.I.'s Program Must Also be Delivered in the Least Restrictive Environment.**

To be eligible for Federal financial services under IDEA, a state must assure that "all children with disabilities who are between ages three and twenty-one receive a free appropriate public education (FAPE)." 34 CFR 300.101; *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982). No child is too severely impaired to be entitled to educational services under IDEA. *Timothy W. v. Rochester, N.H. School District*, 875 F.2d 954 (1st Cir., 1989) (*cert. denied*) 493 U.S. 983 (1989);

3

*Honig v. Doe*, 484 U.S. 305 (1988). However, a program which provides a student with only *de minimus* educational benefits violates IDEA.[2]

### 1.    MPS has a Express Duty to Provide K.I. with Appropriate Assistive Technology.

IDEA requires that a school district assure the provision of assistive technology devices and services as part of a student's FAPE. An assistive technology device is "any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability." 34 C.F.R. 300.5. Assistive technology services are defined as "any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device." 34 C.F.R. 300.6. MPS was required to provide K.I. with appropriate assistive technology devices and services to enable her to improve her functional capabilities and to comprehensively evaluate her needs for the technology. 34 C.F.R. 300.324; *Letter to Naon*, 22 IDELR 888 (OSEP 1995). An augmentative communication device is undisputedly assistive technology. *In re Child with a Disability*, 21 IDELR 749 (SEA 1994).

---

[2]*Polk v. Central Susquehanna Intermediate Unit 16*, IDELR 441:130 (3rd Cir. 1998); *Chris D. v. Montgomery County Board of Education*, 753 F.Supp. 922 (M.D. Ala. 1990); *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982); *Evans v. Bd. of Educ. of the Rhinebeck Central School District*, 930 F. Supp. 83 (S.D.N.Y. 1996)

    **2.    IDEA Requires that a Student be Educated in the Least Restrictive Environment.**

In enacting IDEA, Congress stated its clear preference for requiring the education of students with disabilities, including students with significant disabilities, in the least restrictive environment.  Each school district must assure that students with disabilities are  educated with children who are not disabled, and that special classes, separate schooling, or the removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.  A child must not be removed from a less restrictive environment because of the need to use supplemental aids and services.  34 C.F.R, 300.116, 34 C.F.R., 300.117 and 34 C.F.R., 300.118.  *See also, Greer v. Rome City School District*, 950 F.2d 688 (11th Cir.1991).  This mandate was strengthened in 1997 and in 2004.  IDEA now requires each student's educational program to address the student's communication needs and focus on the student's progress in the general educational curriculum, as appropriate.  34 C.F.R. 300.320, 300.324.

    **B.    Mr. and Ms. I. Requested a Hearing To Challenge K.I.'s Educational Program.**

MPS has consistently told plaintiffs that K.I. can only attend school at the

5

Center or in a homebound placement.  In making this determination, however, MPS

failed to meaningfully evaluate K.I., including her need for assistive technology.

Consequently, Mr. and Ms. I. secured an independent evaluation of K.I.'s need for

assistive technology through Children's Rehabilitation Services (CRS).    That

evaluation was completed, *inter alia*, by Ms. Donna Locke.  Plaintiffs also secured

an evaluation by Dr. Laura Vogtle, an occupational therapist with the University of

Alabama.  Both evaluators recommended, *inter alia*, extensive assistive technology

and placement outside of the Center.

On April 21, 2005, plaintiffs requested a due process hearing to challenge

MPS's failure to evaluate and educate K.I. in accordance with IDEA.  The hearing

began in September 2005,  and it lasted for several non-consecutive days, until

November 9, 2005.   On May 6, 2006, Dr. Makris, K.I.'s physician, testified

confirming that K.I.'s medical condition did not require her placement at the Center.[3]

As long as a nurse was trained to meet K.I.'s needs, she could be educated in a typical

school.  Ms. I. is a registered nurse and, as such, she is a good judge of K.I.'s health

needs. TR 2361-2362.  Consequently, with the exception of Dr. Makris's testimony,

---

[3]This six month lapse occurred while the parties waited for Dr. Makris' records relative to
K.I. to be transmitted from Children's Hospital.  MPS wanted to review the records prior to
examining Dr. Makris.  Dr. Makris's testimony is found in the Transcript of the Administrative
Record, pp. 2357 to 2384.

all of the testimony presented at the hearing concerned K.I.'s needs and her educational program, as of November 2005.  At the time of the hearing, K.I. was in a homebound program.

On August 31, 2006, Hearing Officer Cole found in favor of the District. Plaintiffs have filed an appeal to this Court, as the administrative decision is contrary to both binding precedent, including *Cedar Rapids Kennedy School District v. Garet F.*, 29 IDELR 966 (U.S. 1999), *Greer v. Rome City School District*, 950 F.2d 688 (11th Cir.1991), and the great weight of the evidence.

In January 2007,  K.I. returned to the Center.  MPS still will not allow K.I. to attend a special education class in a regular education school, even with the provision of a nurse who is trained to meet K.I.'s needs.  Since returning to the Center, MPS has placed  K.I. with another teacher.  MPS has also developed subsequent IEPs for K.I.

## III.    PLAINTIFFS SHOULD BE ALLOWED TO ADMIT SUPPLEMENTAL EVIDENCE.

### A.    Pursuant to 11th Circuit Precedent, Plaintiffs' Request to Admit Additional Evidence Should Be Granted.

20 U.S.C. 1415(i)(2)(C)(ii) governs the supplementation of evidence to the administrative proceeding. It states, "the court shall receive the records of the administrative proceedings, *shall hear additional evidence at the request of a party*, and basing its decision on the preponderance of evidence, shall grant relief as the

court determines is appropriate." (Emphasis added).

Although 20 U.S.C. 1415 does not detail criteria for admitting additional evidence, the Eleventh Circuit has adopted a standard for ruling on this issue. *Walker Co. School District v. Bennett*, 203 F. 3d 1293 (11th Cir. 2000). *See, also*, *School Board of Collier County Florida v. K.C.* 285 F.3d 977 (11th Cir. 2002).

In *Walker*, the Eleventh Circuit was asked to determine whether a district court had properly responded to a request to admit supplemental evidence. A school district asked the Court to hear and admit a "substantial volume of testimonial and documentary evidence," in addition to the administrative record. *Walker* at 1295. The evidence sought to be admitted included nineteen witnesses and three categories of tangible or documentary evidence. Concerned, *inter alia*, that the school district might have saved its best evidence for the appeal, the district court admitted only the deposition testimony of one witness and limited documentary evidence.

In affirming the district court's decision, the Eleventh Circuit decided to adopt the First Circuit's decision in *Town of Burlington v. Dep't of Education*, 736 F.2d 773 (1st Cir. 1984), which it considered the leading case on the issue. The Court stated that IDEA:

> . . . contemplates that the source of evidence generally will be the administrative hearing record, with some supplementation at trial. The reasons for supplementation will vary; they might include gaps in the administrative

transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events subsequent to the administrative hearing. The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.

*Walker* at 1298. Further, the Court noted that the above factors do not constitute an exhaustive list of reasons for allowing supplemental evidence. *See*, *Id*. at 1299 f.n. 12. In reaching its decision, the Court rejected a request for a rigid rule of admission, which would disallow testimony from any witnesses who did or could have testified at the administrative hearing. The Eleventh Circuit declined to adopt this rule, stating that it would "unduly limit a court's discretion and constrict its ability to form the independent judgment congress expressly directed." *Walker* at 1298.

The Eleventh Circuit crafted a simple framework to give judges the broadest possible discretion in determining whether to admit additional evidence. The analysis should begin, not with an automatic exclusion of additional evidence, but with the rebuttable presumption that a witness who testified at the administrative hearing should not be allowed to testify at trial, subject to the Court's discretion. The party wishing to offer additional witnesses should then submit a motion including a description of the evidence, detailing the reasons why the evidence should be admitted as relevant and non-cumulative. *See, also School Board of Collier County*

*Florida v. K.C.* 285 F.3d 977, 981 (11th Cir. 2002) (Eleventh circuit affirmed a district court's decision which allowed the school board to submit additional evidence due to the board's "solid justification" as to the necessity for adding the expert witness testimony, which apparently clarified some of the issues before the district court.)

As will be explained, application of *Walker* and *Collier* supports Plaintiffs request to submit additional evidence. An examination of the relevant portions of the record demonstrates that the additional evidence is not cumulative. Rather the evidence concerns events which occurred after the hearing in relation to K.I.'s current status, her progress and the appropriateness of her continued placement at the Center. This evidence is highly relevant to this Court's ultimate determination as to what constitutes an appropriate placement for K.I. *See also Burlington* at 791, ("We also recognize that in many instances experts who have testified at the administrative hearing will be bringing the court up to date on the child's progress from the time of the hearing to the trial.").

**B.    Plaintiff's Request to Admit Additional Evidence is Also Supported with Case Law from Other Circuits.**

A review of decisions from other courts, including courts within the Seventh and Ninth Circuits, also supports Plaintiffs' request to supplement the record. Plaintiffs make reference to these cases within the seventh and ninth circuits because

the Eleventh Circuit stated that it aligned itself with those circuits in *Walker*. Such cases hold that evidence updating a court on a child's current status is often relevant, especially given the policy considerations underlying IDEA. Any doubts about admission of additional evidence should be resolved in favor of admission.

In *Hernandez v. Bd. Education of City of Chicago,* 2001 WL 477222 (N.D. Ill. 2001), the court relied, in part, on *Walker* to allow plaintiffs to present the additional testimony of Dr. John Lynch, a private psychologist, and Dr. Howard Atlas, a school psychologist, concerning relevant events that occurred after the administrative hearing. The hearing officer in *Hernandez* discounted Dr. Lynch's first evaluation due to the short amount of time he had been seeing the child. By the time of trial, Dr. Lynch had been treating the child for over a year, thus, curing the brevity problem.

Dr. Atlas did not testify at the hearing. His evaluation was admitted, not as an attempt to repeat earlier testimony about the child's condition or embellish the earlier testimony of experts whose credibility the hearing officer may have questioned, but rather to give an up-to-date evaluation of the child's condition and needs. The court found that:

> evidence of [the child's] current medical and psychological condition, as well as evidence of the continuing, post-administrative order impact of the school board's alleged failure to provide [the child] with the necessary services, would aid the court in making an independent determination of the school board's compliance with IDEA." *Id*. at *5.

11

*See also, Summer H. ex rel Hannah H. v. State of Hawaii Dept. of Ed.,* 2007 WL 1153807 (D.C. Ha 2007) (plaintiffs sought to supplement the record with reports from six different experts regarding the child's post-hearing status. Since the reports addressed only the child's status after the due process hearing, the Court found that they were neither "duplicative" nor "cumulative.") *Id*. at *6.

In *Met. Bd. of Public Ed. of Met. Gov. Nashville v. Bellamy,* 2004 WL 2452567 (6th Cir. 2004), the Sixth Circuit upheld the district court's admission of two experts' testimony for the purpose of determining whether an earlier IEP was reasonably calculated to provide educational benefits. The school designed the IEP under the assumption that the child had mental retardation. The experts conducted further assessments which challenged that assumption. Plaintiffs argued that such evidence, which went "directly to the questions of whether, how and what [the child] can learn, applies directly to whether [the challenged IEP] was appropriate to her educational needs." *Id*. at *5. The Sixth Circuit agreed, holding that the child's progress after the more accurate evaluation of her disability could indeed be used as evidence "to support plaintiff's conclusion that her diagnosis of her disability - and therefore her educational plan - was inappropriate." *Id*.

In *Russell v. Jefferson Sch. Dist*., 609 F. Supp. 605 (N.D. Cal. 1985) the plaintiffs sought to admit evidence of the child's current medical condition at the trial

12

level. In granting the plaintiff's motion, the court stated that:

> during the pendency of court proceedings dealing with the education of handicapped children under the act, it is likely that their physical, mental and educational conditions will change over time. Those changing conditions could result in a series of civil action and referrals back to hearing officers whenever there were changes in conditions. The courts would then be making decisions about children's education based on information which is months and perhaps years old. And there could be lengthy delays before reaching decisions." *Id*. at 608.

Due to the sixteen month delay between the hearing and trial, the court felt that supplementing the record was necessary to allow the court to make a decision which is both fully informed and timely and thus conserve judicial resources.

In *Mr. and Mrs. I. ex rel L.I. v. Maine Sch. Admin. Dist. No. 55*, 2004 WL 2397402 (D.C. Me. 2004), the court granted plaintiff's motion to supplement the record with the testimony of the child's mother and the child's new counselor, as well as an affidavit from a neurologist. It was anticipated that the student's mother would testify to the child's experiences since the hearing, as well as the child's current emotional and medical status. The counselor would testify to the child's current needs and the neurologist's affidavit would explain an evaluation which was at issue. The court found that this evidence was admissible because it was relevant and not a mere embellishment of prior administrative hearing testimony. Notably, the court also stated that

13

the parents have cited, and my own research has unearthed, cases in which, in the context of review of decisions concerning both the adequacy of IEPs and eligibility for special services, courts have erred on the side of admitting evidence affecting a child's post-hearing status on the theory that the proffered information might shed light on the reasonableness of (and thus be relevant to) the earlier decision" *Id*. at *3.

*See also, R.B. v. Bartholomew Cons. School Corp.*, 2004 WL 1087367 (S.D. Ind. 2004) ("the better approach is to hear the evidence, to allow defendants ample opportunity to rebut and challenge it, and to consider its weight in light of all the evidence in the administrative and court record." (*Id.* at *2).

In *Susan N. v Wilson Sch. Dist.*, 70 F.3d 751 (3d Cir. 1995), the court remanded a case for the lower court to consider the admissibility of the child's post-hearing progress, stating,

> Congress' central goal in enacting the IDEA was to ensure that each child with disabilities has access to a program that is tailored to his or her changing needs and designed to achieve educational progress. Children are not static beings; neither their academic progress nor their disabilities wait for the resolution of legal conflicts. While a district court may appropriately exclude additional evidence, a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether congress' goal has been reached for the child involved. Consequently, on remand, the district court should use this standard in determining whether to admit the proffered additional evidence, i.e. would the evidence assist the court in ascertaining whether congress' goal has been and is being reached for the child involved." *Id*. at 760, (citation and internal quotation marks omitted).[4]

---

[4]*See also, Jean N. and Lee N. v. Tirozzi*, 17 IDELR 580 (D.C. Conn. 1991)(finding that, because over two years had passed since the administrative hearing, *Burlington*'s rebuttable presumption concerning the exclusion of witnesses who testified at the administrative hearing

Therefore, as will be explained ,granting Plaintiffs's request to supplement the record would not only be supported by decisions from other courts, but would further the policy concerns central to the IDEA.

## C.    Plaintiffs' Proffer of Evidence.

Plaintiff seeks to add live supplemental testimony from Dr. Vogtle and Ms. Locke, as well as testimony from Rochelle West.  Since the due process hearing, K.I. has continued to be served by CRS.  Rochelle West, a speech and language therapist has replaced Ms. Locke at CRS.[5]   On May 18, 2007, Vogtle, West and Locke

---

level was overcome and the Plaintiff's four experts could testify to the child's current condition); *Johnson v. Metro Davidson Co. School System*, 108 F.Supp. 2d 906, 915 (M.D. Tenn. 2000)(admitting evidence of child's psychological treatment and medical care subsequent to the initial hearing as well as her up-to-date educational records, noting that "the Sixth Circuit applies a fairly liberal standard for the admittance of evidence to the extent that it sheds light on the reasonableness of the original decision");  *Justin G. v Bd. of Ed. of Montgomery County*, 148 F.Supp. 2d 576, 585 (D.C. Md. 2001)(holding that evidence of a child's post-iep progress at a private placement school "properly supplements the record by giving the court a complete picture of the child's needs and whether [private school] could meet his special needs"); *Doe v. West Boylston School Committee, et al.*, 28 IDELR 1182, 19 (D. Mass. 1998)(granting Plaintiff's motion to supplement the Record because "updates regarding Joseph's responsiveness to the program - evaluations after his completion of a full school year at the Eagle Hill School - provide relevant information regarding whether the school was aan appropriate placement for Joseph"); *C.G. v. Five Town Community School District*, 436 F. Supp.2d 181 (D. Me. 2006) (Court permitted supplemental evidence  regarding the plaintiff's status and programming since her hearing); *Schoenbach et al. v. District of Columbia, et al.*, 309 F.Supp. 2d 71, 82 (D.D. C. 2004) (Court held that new IEP notes and new IEP relevant to current case and therefore admissible as "a child's educational needs at the time of trial may be relevant in determining the child's needs at the time of disputed events").

[5]Locke still is employed by CRS, but she has been promoted.

conducted an evaluation of K.I. in her current educational program.

Pursuant to *Walker,* the logical starting place for determining the admissibility of additional evidence should begin with an examination of relevant portion of the administrative record. Since plaintiffs seek to admit evidence from three expert witnesses, the following constitutes an examination of the administrative record as to the witnesses' previous testimony.

### 1.      Dr. Laura Vogtle' Previous Testimony.

On October 12, 2005, Dr. Vogtle testified as an expert witness at the due process hearing. Her testimony is found in the administrative hearing Transcript, pp. 961 to 1161. Her testimony is also discussed in Hearing Officer Cole's Decision, pp. 122-148, 214-219.

Vogtle has 35 years of experience as an occupational therapist in various pediatric settings.(TR 962-963. She has worked with several schools regarding students with disabilities and has developed numerous IEPs. TR 966-967. Vogtle has extensive experience working with children with arthrogyposis and is considered an expert in assistive technology, with a focus on wheelchairs and communication devices. Vogtle is also an augmentative communication consultant with Children's Rehabilitation Services (CRS) in Birmingham, AL. TR 967-970; Plaintiffs' Exh. 35. Prior to the hearing, Vogtle conducted an independent evaluation of K.I. during three

separate visits. Vogtle viewed K.I.'s educational records and she accompanied K.I. to CRS in Montgomery, AL.  She also spoke with Annie Cartwright, K.I.'s then current teacher.  TR 977-979; Plaintiffs' Exh. 36.

As will be explained, Vogtle testified that K.I. needs, and has needed for the past several years,  access to appropriate assistive technology devices and services, to include, *inter alia*, an augmentative communication system.   K.I. also needs to be placed in an educational program outside of the Center that will enable her to interact with other less or non-disabled children.

Vogtle testified that due to K.I.'s physical and communication limits, she requires assistive technology, to include a communication device.[6]   In order to appropriately identify an assistive technology device to meet K.I.'s needs, she must be comprehensively evaluated by professionals with expertise in technology.  TR 971-976.[7]  The first step of the evaluation is to locate several sites which can be used to activate a switch which will further activate the communication device.  One activation point might relate to K.I.'s use of her arms, which are straight in front of her.  TR 975-976, 979-980.  Since K.I. is easily fatigued, it is important to identify

---

[6]An augmentative communication device is used to assist an individual communicate usually via speech.  Not all assistive technology devices are high-tech.  TR 696-971.

[7]The District evidently was concerned whether K.I. understood "cause and effect."  TR 978-979.

17

several different access areas to serve as "back up" sites. TR 983-985. Multiple sites will also allow K.I. to activate different types of devices to control her environment. TR 983. Selection of these sites necessitates a detailed physical evaluation of K.I.'s range of motion, muscle strength and positioning to identify in which positions K.I. best operates. TR 983-985. Allowing K.I. to access a switch by holding it in front of her (one method used by Cartwright) is inappropriate. TR 989-990. It was also inappropriate for Cartwright to "pick" a switch and expect (K.I.) to use it. TR 991. K.I. needs a very light resistance switch which can be placed close to her body. TR 989.

K.I. will also need to use a "mount" to mount the switch at the activation site. It is also critical to select the correct mount. As when selecting a switch, "exhaustive data collection" must occur during the mount selection phase. TR 989-995. This should include examining such things as the time of day, K.I.'s positioning, distractions in the room, K.I.'s motivation, and the activity in which K.I. is asked to participate. It is important to implement a trial period or any switch to evaluate its utility over an extended period of time. This analysis must be done systematically and appropriate adjustments must occur as K.I. begins to use the technology. It is critical that the persons who select and implements the technology have an expertise in this area because to avoid the tendency that an untrained teacher will simply

18

conclude– incorrectly– that K.I. cannot benefit from the technology due to that teacher's lack of expertise or experience. TR 991-995, 1021-1022. Consequently, K.I.'s teacher receive extensive training regarding the use of assistive technology. TR 991-935.

According to Dr. Vogtle, despite K.I.'s obvious physical limitations and inability to speak, MPS failed to assess, *inter alia*, K.I.'s need for assistive technology devices and services. Accordingly, Plaintiffs arranged for K.I.'s evaluation at CRS Augmentative Communication Clinic. TR 1021, 1053-1054, 1069-1070.

Dr. Vogtle also testified that K.I.'s program at the Center was inappropriate. *Inter alia*, Cartwright did not have an adequate expertise in utilizing assistive technology.[8] While, Cartwright used some switches and mounts, she used them randomly and without conducting the prerequisite evaluation and analysis. Some of switches selected were obviously ill suited for K.I.'s physical limitations. For example, Cartwright tried to get K.I. to access a switch with her feet, although K.I. has no lower extremity movement. TR 1055-1056. According to Cartwright, none of the assistive technology used on K.I. seemed to work. TR 978-979. However, Cartwright reached this conclusion because she lacked the education and experience to appropriately select either a communication device or a switch which would meet

---

[8]Cartwright admitted this. TR 216-217.

K.I.'s needs. TR 1055-1056.

Vogtle testified that Cartwright did not know how to appropriately teach K.I. how to use technology and appropriate data collection did not occur. TR 1055-1057. Vogtle saw no switch mounts in Cartwright's class, and this lack was problematic. Rather than use mounts, Cartwright held the switches in front of students, which had the additional negative effect of only allowing K.I. a limited opportunity to try to use the random switches. TR 1012-1015, 1017, 1031-1032. K.I. needs to be able to use the technology to practice her communication skills throughout the day, and not just when her teacher allows her access to a switch. TR 1031-1032.

Vogtle testified that K.I. was responsive, made eye contact and was socially interactive, indicating to Vogtle that K.I. likely was not significantly cognitively delayed. TR 998, 1023, 1035-1038. In Dr. Vogtle's professional opinion, if K.I. had received appropriate educational services, K.I. should have been performing at a higher level. This was especially true given that children with K.I.'s diagnosis do not typically have cognitive impairments. TR 1071-1072, 1079.

Dr. Vogtle testified that K.I. would benefit significantly from contact with typical and less disabled children. TR 1036-1038, 1082-1084. K.I. should be placed in a special education class, in a regular school setting which would allow some opportunity for mainstreaming and peer-mediated learning, which would equate to

greater educational opportunities since children often learn from each other. Placement in a special class with less disabled children, to include some mainstreaming, would expose K.I. children whose social norms and behaviors are reflective of the real world. It would help K.I. learn to communicate and socialize. TR 1014, 1072-1078, 1084-1086. Thus, Vogtle was very concerned that K.I. was placed in a school which contained only students with significant disabilities. All of the students in K.I.'s class were nonverbal. TR 1009, 1072-1076. The educational environment at the Center was "malnourished" and K.I. was limited to playing the role of "a passive recipient." TR 1014-1016, 1082-1084. Finally, Vogtle testified that K.I.'s IEPs from 2001 to 2005 were not designed to provide a FAPE to K.I. TR 1093-1094.

### 2.    Rochelle West's Involvement and Donna Locke's Previous Testimony.

Ms. Rochelle West is K.I.'s current speech and language pathologist at CRS. West began working with K.I. after the hearing. She did not testify at the administrative hearing. Ms. West's predecessor, Ms. Donna Locke, did testify. Ms. Locke's testimony can be found in the Administrative Hearing Transcript pp. 581-673. Her testimony is also discussed in Hearing Officer Cole's Decision, pp. 98-111. *See also* Pltf's 28.

Ms. Donna Locke has a Masters Degree in speech and language from the University of Tennessee. She is a speech and language therapist and has obtained an National Certificate of Competence. Locke oversaw the Augmentative Communication Clinic at CRS. She testified that she has worked with several school districts to provide students with disabilities assistive technology, to include augmentative communication devices. She also has assisted with the development of numerous IEPs. TR 581-586. Locke conducted an evaluation of K.I. and assessed K.I.'s ability to use an augmentative communication technology from a speech and language perspective.

Locke evaluated K.I. and found that K.I. was very responsive and had good communication potential. Locke thought that K.I. understood the concept of "cause and effect," but that K.I. was "trapped in her body." TR593-595, 598. K.I.'s physical limitations did not mean that K.I. was cognitively impaired and that, with appropriate technology, K.I. has the potential to learn traditional academics, such as the alphabet, colors and numbers. TR 596-599.

K.I. has the ability to activate a switch to access a communication device. Based on K.I.'s physical limitations Locke recommended that K.I. be given a "credit card" switch, which requires very light pressure. TR 595-596. Locke gave K.I. a switch, as well as toys to practice using the switch, so as to demonstrate her

understanding of cause and effect. K.I. also requires a communication system which is mobile. TR 600-601.

One of K.I.'s most significant needs was to receive direct speech and language services for at least one hour per week. The services must be designed and delivered by a pathologist who is specifically trained to use augmentative communication. In addition, for at least one hour each day, K.I. needs to intensively work on her communication skills with a special education teacher. It is also critical that K.I. be afforded continuous opportunities to use any communication device throughout the day. If K.I. is only allowed to occasionally practice using the technology, her progress will be delayed. TR 602-605.

K.I.'s placement at the Center is inappropriate, *inter alia*, in that she was only occasionally allowed to use the technology. TR 602-605. Based on her experience in working with other students similar to K.I., Locke was extremely surprised that K.I.'s educational program did not already include an augmentative communication system. TR 599-601. Locke also testified that K.I.'s IEPs were not designed to offer K.I. a FAPE. TR 609-612. The District's program failed completely to address K.I.'s receptive language needs. TR 602-605, 616. Locke testified that K.I. needed to be placed in a less restrictive environment and that K.I. be mainstreamed at least part of the day with students without disabilities. Locke saw no reason why K.I. could attend

23

a special education class in a typical school. TR 629-632.

>        3.        **The Proposed Supplemental Testimony of Dr. Vogtle, Donna**
>                  **Locke and Ms. West.**

>                a.        **Dr. Laura Vogtle's expected testimony**.

It is anticipated that Dr. Vogtle will testify that she has evaluated K.I.'s current

status, including K.I.'s progress since the hearing and the appropriateness of her

current educational program. Dr. Vogtle is expected to testify about:[9]

1.        The appropriateness of MPS' current use of assistive technology in K.I.'s

class, including K.I.'s current instructional staff and aides' abilities to properly

instruct K.I., in the use of technology.   This testimony will address K.I.'s current

physical limitations and the relationship between those limitations and K.I.'s need for

the assistive technology now recommended by CRS.

2.        K.I.'s progress since the hearing, to include K.I.'s progress in

demonstrating her understanding of "cause and affect." Vogtle is expected to testify

about K.I.'s motivation, her responsiveness and her current social skills.   Such

testimony will explain the relationship between K.I.'s current abilities in these areas

---

[9]Plaintiffs are unsure how much detail to provide in their description of any of the witnesses' anticipated testimony.  Since this Court's Order (Doc. 27) stated that the actual testimony should not be submitted, Plaintiffs are attempting to generally outline the topics to be addressed by the witnesses, without giving all of the anticipated testimony.  In the event Plaintiffs have provided too little detail, naturally, they would be happy to supplement this submission with more information.  Hopefully, plaintiffs have not provided too much detail about the anticipated testimony.

and K.I.'s potential cognitive abilities.

3.    The utility and age appropriateness of K.I.'s current  educational program, including testimony as to  whether certain activities in K.I.'s current class are designed to teach K.I. functional skills.

4.    The relationship between K.I.'s current status and her present level of responsiveness regarding her need for socialization with less disabled peers.   Such should include testimony about the impact of  K.I.'s current strengths on her need for an educational program in a less restrictive environment.   It is believed that Dr. Vogtle will testify about K.I.'s limited ability to progress in a class with other students who have significant disabilities.

**b.    Rochelle West's Anticipated Testimony**.

Rochelle West is a speech and language pathologist for CRS.  West  has been K.I.'s primary speech and language therapist at CRS since about March 12, 2007. West has worked with K.I. to help K.I. to effectively utilize assistive technology, including an augmentation communication device.   West evaluated   K.I. in her current educational program on both May 8, 2007 and May 18, 2007.

It is anticipated that West will testify about:

1.     K.I.'s recent evaluations at CRS and her use of the "credit card" switch since the hearing.  This testimony shall include an assessment of K.I.'s ability to use

other switches, including those designed for persons with limited hand movements. It will also include evidence of K.I.'s need for extensive exposure to various types of switches and switch activities to enable K.I. to practice her developing skill.

2.      K.I.'s progress, including K.I.'s current ability to demonstrate her understanding of "cause and effect" when working with switch toys and other activities. West will also likely testify about K.I.'s current ability to appropriately respond to various stimuli, including K.I.'s current ability to visually track.

3.      The appropriateness of K.I.'s current educational program, including K.I.'s need for consistent communication opportunities throughout her school day with students who can verbally communicate.

4.      K.I.'s motivation, from a speech and language perspective, including testimony regarding the importance of utilizing, interaction and multi-sensory tasks motivate K.I.. This testimony will address the significance of K.I.'s demonstrated enjoyment of social interactions, and K.I.'s current need for a more stimulating environment to include placement in a less restrictive environment with students who are less impaired.

### c.      Donna Locke's Expected Testimony.

Locke's testimony is offered to identify K.I.'s progress since Locke evaluated her two years ago. Locke is in a unique position to compare K.I.'s then current

speech and language abilities with her present abilities.  Locke can also testify as to

K.I.'s progress  and compare K.I.'s current responsiveness and visual tracking with

K.I.'s skills in 2005.  Locke can testify about  K.I.'s present need for additional

auditory and visual stimulation.   Locke can also testify about the relationship

between K.I.'s present level of functioning and her need for a less restrictive

environment to provide K.I.  with an opportunity to demonstrate her potential.

### 4.    Plaintiffs' Supplement Evidence Should be Admitted.

The evidence described above should be admitted because it is consistent with

the standard articulated in *Walker* and *Collier* and with the case law in other circuits

discussed at length above.

The evidence which plaintiffs seek to admit is non-cumulative. It will not

duplicate earlier testimony because it is based on evaluations, information and

analysis conducted since the hearing.  The testimony concerns K.I.'s present status

to include her progress since the hearing.  It also addresses her present educational

program and her subsequent IEPs.

The evidence is offered under one of the factors identified in *Walker* which

could justify the additional evidence, namely, that the evidence concerns relevant

events which occurred after a due process hearing.  Unlike in *Walker*, here, plaintiffs

did not intentionally exclude this supplemental evidence for tactical purposes.

Plaintiffs also do not request the admission of testimony from numerous witness and they do not seek the introduction of numerous documents.

Plaintiffs' proposed evidence is also highly relevant. It will assist this Court in determining whether MPS has offered, and is offering, K.I. an appropriate program. It will help this Court decide whether K.I. must remain at the Center. Evidence of K.I.'s present needs will shed light on her need for additional opportunities to use assistive technology and to use it in a less restrictive placement in order to further develop K.I.'s potential.

The relevancy and admissibility of the supplemental testimony are supported more specifically by case law. One of Plaintiffs' main contentions is that MPS had failed to appropriately evaluate K.I.'s need for assistive technology. Instead, MPS assumed that K.I. had little potential to use the technology to communicate, socialize and/or function at a higher lever. While Cartwright attempted to teach K.I. how to use technology, she did so in a haphazard fashion. As a result, Cartwright concluded that "nothing worked." No other efforts were made to assess K.I.'s potential. Rather, K.I.'s educational program was limited to either placement at the Center or at home, where she remained "locked in her body." Like the Plaintiffs in *Bellamy*, Plaintiffs here dispute the assumption of abilities upon with the District based its IEP and provision of services. The Sixth Circuit admitted testimony concerning subsequent

evaluations and progress as relevant to its ultimate determination of the appropriateness of the child's educational plan. Admission of the testimony proffered here is consistent with this holding.

Vogtle's testimony concerning her observation of K.I. in class is especially relevant as hearing officer Cole discounted her testimony because she did not observe K.I. while K.I. was at the Center. Vogtle was unable to observe K.I. in Cartwright's classroom because K.I. was placed on homebound services at the time of Vogtle's evaluation. The court in *Hernandez* admitted testimony of an expert whose testimony at the hearing level was discounted due to the short time he had been observing the child. Allowing evidence of Vogtle's observation of K.I.'s current placement will cure any alleged past deficiency in her testimony and is consistent with this holding.

In requiring a student's IEP to be revised at least annually, the IDEA recognizes the constant change surrounding the educational life of each child. Case law bears this out. As the Third Circuit stated in *Susan N*., "children are not static beings: neither their academic progress nor their disabilities wait for the resolution of legal conflicts." *See also Summer H., supra*.(wherein the court allowed supplemental evidence regarding the child's then current ability (after the hearing) to attend to tasks.) If plaintiffs are not allowed to admit supplemental evidence about

29

K.I.'s current needs, then all of the evidence before this Court will concern K.I.'s functioning in 2005. Such a result is inconsistent with the principles articulated in IDEA and would deny this Court the opportunity to render a complete and timely decision in this matter.

        **D.**    **Plaintiffs Should Be Allowed to Admit Evidence Relevant To Their Section 504 Claim**.

Plaintiffs' complaint was also filed under § 504 of the Rehabilitation Act, 29 U.S.C. 794. Nothing in § 504 authorizes a court to restrict the admission of additional evidence. *See Special Education Law and Litigation Treaties,* Webber, Mark C, 2ed, (April 2002, LRP Publications), § 22: 4.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court grant this Motion and allow the plaintiffs to submit additional testimony relevant to K.I.'s placement since the date of the administrative hearing.

                                        Respectfully submitted,

                                        /s/Deborah A. Mattison
                                        Deborah A. Mattison
                                        Counsel for Plaintiffs

**OF COUNSEL:**
**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**
The Kress Building
301 19th St. North

Birmingham, Alabama  35203
(205) 314-0500

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on June 13, 2007, filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Buddy Scott
James R. Seale
Erika P. Tatum

<u>/s/Deborah A. Mattison</u>
OF COUNSEL