IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| K.I., by and through her mother and next friend, JENNIE I., and JENNIE I., individually, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:06-cv-905-MEF |
| MONTGOMERY PUBLIC SCHOOLS, | ) ) | WO-PUBLISH |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

K.I., a child afflicted with arthrogryposis, and Jennie I., K.I.'s mother, (collectively "the Plaintiffs") seek review of an unfavorable administrative decision under the Individuals with Disabilities Education Act ("IDEA") and bring claims pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 749 for education in the least restrictive environment. This cause is before the Court on dispositive motions from the Plaintiffs (Docs. # 81, 83) and the Defendant Montgomery Public Schools ("MPS") (Doc. # 79). The Court has carefully considered all submissions from the parties and the applicable law. For the reasons that follow, the Court finds that the Defendant's motion (Doc. # 79) is due to be GRANTED in part and DENIED in part. The Plaintiffs' motion for partial summary judgment on their § 504 claims (Doc. # 83) are due to be DENIED. The Plaintiffs' motion for reversal of administrative decision (Doc. # 81) is due to be GRANTED in part and DENIED in part.

## FACTUAL SUMMARY

### A. K.I.'s disability

K.I. suffers from a rare congenital condition called arthrogryposis. Arthrogryposis is characterized by multiple joint contractures, muscle weakness, and fibrosis. Typically, arthrogryposis is a non-progressive disease but cannot be reversed. Vigorous physical therapy and in some cases surgical intervention have been shown to improve quality of life. K.I. also suffers from a rare form of Muscular Dystrophy and Restricted Lung Disorder.

In K.I.'s case, arthrogryposis causes extensive joint stiffness and significantly limits her range of motion. The condition prevents K.I. from speaking,[1] raising her arms, or eating by mouth.[2] K.I. is able to move her head, can move her arms if they are low, and can use her hands while wearing custom splints. K.I. is wheel-chair bound, and must wear a diaper or comparable undergarment. Arthrogryposis is treated with extensive physical and occupational therapy. Because K.I. is unable to cough, she is prone to developing respiratory infections and pneumonia. K.I.'s airways must be periodically suctioned to prevent these respiratory problems from occurring.

### B. K.I.'s attendance at the Children's Center

From the time she was in pre-school until November 15, 2004, K.I. was educated at the Children's Center, a self-contained school for children who require specialized medical

---

[1] K.I. could speak until the age of two.

[2] Since the age of four, K.I. has used a gastronomy tube.

2

care.  Approximately one hundred students attend the Children's Center.  In addition to specially trained teachers, the Children's Center employs five nurses.  The presence of these nurses is important for K.I.'s care, because pursuant to regulations of the Alabama Board of Nursing, invasive procedures cannot be delegated to unlicensed personnel in the school setting.  K.I. requires feeding through a gastronomy tube and suctioning, both of which are classified as invasive procedures.  Accordingly, K.I. requires almost constant nursing care.

There are approximately 175 days in each school year.  Each year that she attended school at the Children's Center, K.I. missed a significant number of school days due to illness or surgery.  Each year between 2000 and 2004, K.I. missed one hundred or more school days.  Between August 2004 and her last day at the Children's Center in mid-November 2004, K.I. only attended twenty days of school.  At that time, Jennie I. became concerned that poor hygiene practices at the Children's Center were causing K.I. to become sick, so she removed K.I. from school.

MPS offered to provide K.I. with homebound services in 2000 and in 2001, but her parents refused to accept these services until 2005.[3]  At the time this lawsuit was filed, K.I.

---

[3]  The Plaintiffs dispute whether or not MPS offered homebound services at all before 2005.  Evidence demonstrates that if MPS offered homebound services prior to 2005, MPS did not make the offer in writing.  The due process hearing officer found, based on testimony from MPS's witnesses, that MPS had in fact made an oral offer of homebound services.  There is evidence in the record to support this finding, and accordingly this Court will give it due deference.

was homebound and receiving weekly in-home services from a special education teacher, a speech therapist, and a physical therapist. K.I.'s parents request that she be "mainstreamed" so that she can attend school with children who are not disabled. K.I. attended four days at a three-week summer program at a mainstream, neighborhood school during the summer of 2005 without incident.

### C.  K.I. is evaluated by Dr. Laura Vogel

In the summer of 2005, K.I.'s parents asked Dr. Laura Vogel, an occupational therapy expert, to evaluate K.I.[4]  This is the first true occupational therapy evaluation ever conducted on K.I.  According to the record, an occupational therapy assessment was done at the Children's Center in 2000, but the Plaintiffs assert that the assessor never worked with K.I. one-on-one.  Instead, they say the report was based on anecdotal evidence.

Dr. Vogel's report emphasizes the need to utilize switches and other assistive technology to increase K.I.'s communications skills.  Dr. Vogel also focused on the importance of exposing K.I. to non-disabled children, either through the use of a peer helper or in an integrated classroom.

### D.  K.I. requests an administrative hearing

In April of 2005, the Plaintiffs requested an administrative hearing with the Alabama Department of Education.  In this request, Jennie I. alleged that MPS had failed to provide K.I. with a free appropriate public education ("FAPE") in the least restrictive environment

---

[4]  During the due process hearing, the parties agreed that MPS would reimburse K.I.'s parents for the cost of this evaluation.

as required by the IDEA.  Specifically, Jennie I. claimed: (a) that MPS had failed or refused to assure K.I. comprehensive and timely evaluations, including in the areas of her cognitive ability, self-help skills, and assistive technology; (b) that K.I.'s program at the Children's Center is too segregated and restrictive; (c) that MPS failed to offer appropriate assistive technology devices, including an augmentative communication device; (d) that MPS failed to provide K.I. with any academic services, as well as any program to allow the development of self-care skills; and (e) that MPS failed to provide K.I. with a homebound program when she could not attend school.

Jennie I. was dissatisfied with K.I.'s individualized education plan ("IEP") for several reasons.  She was concerned that the plans beginning in 2002 included goals that either K.I. could never accomplish or tasks that K.I. could already accomplish.[5]  Jennie I. was also concerned by the lack of what she called "academic goals" and the fact that the plans were not based on expert evaluations.  According to her mother, K.I.'s classroom was not sufficiently outfitted to accommodate her wheelchair.  For example, K.I. had to be placed sideways at the table because her wheelchair would not fit underneath the table.

Dr. Joseph Morton, the State Superintendent of Education, appointed Michael P. Cole ("Cole" or "the hearing officer") to serve as hearing officer for the due process hearing.  Cole conducted the due process hearing over a period of eleven days ending in May 8, 2006.  On

---

[5]  Several of K.I.'s goals were related to eye gazing, which Jennie I. contends K.I. could already do.  Conversely, other of K.I.'s goals delt with rolling, which Jennie I. contends K.I. will never be able to accomplish, due to her disability.

August 31, 2006, Cole issued a decision in which he determined that MPS had provided K.I. with a FAPE in the least restrictive environment, namely the Children's Center.  Cole also determined MPS had not committed any procedural violations of the IDEA.  Accordingly, K.I. and Jennie I. did not succeed on any of their claims in the due process hearing.

### E.  Procedural history

On October 6, 2006, the Plaintiffs filed this action, pursuant to 20 U.S.C. § 1415, seeking a reversal of the hearing officer's administrative decision, and brining claims under § 504 of the Rehabilitation Act. Later, Plaintiffs sought and received leave to amend the complaint.  (Doc. # 63).  The Amended Complaint seeks the following relief:

(1)  Reversal of the hearing officer's decision;

(2)  A declaration that the defendant's education and due process practices, polices, procedures, and conditions are violative of plaintiffs' rights as secured under § 504 of the Rehabilitation Act and IDEA;

(3)  A permanent injunction enjoining the defendants, their agents, successors, employees, attorneys, and those action in concert with the defendants, from continuing to violate plaintiffs' rights under § 504 of the Rehabilitation Act and the IDEA[6];

(4) All relief requested in the due process hearing, including compensatory damages

---

[6]  Plaintiffs indicated that the Court need not consider their request for a preliminary injunction unless and until they filed a motion and supporting brief regarding such relief.  (Doc. # 27).

6

under § 504 of the Rehabilitation Act;

(5) Compensatory education and/or the educational services K.I. would have received absent the defendant's unlawful conduct;

(6) A declaration that the Plaintiffs are the prevailing party; and

(7) An award of attorneys' fees and costs.

The parties have jointly submitted the lengthy record from the administrative hearing. The matter is now before the Court on cross motions.  MPS contends that Cole's decision is due to be affirmed and that it is entitled to summary judgment on the § 504 of the Rehabilitation Act.  (Doc. # 79).  Plaintiffs argue that Cole's decision is erroneous (Doc. # 81) and that they are entitled to summary judgment on their § 504 claim.  (Doc. # 83).

Specifically, the Plaintiffs argue (1) that Cole incorrectly determined that MPS had offered K.I. a FAPE as required by the IDEA, (2) that Cole incorrectly determined that MPS had provided K.I. with an education in the least restrictive environment, as required by the IDEA, and (3) that MPS should have offered K.I. homebound services when K.I. was unable to attend school.  Plaintiffs also argue that they are entitled to damages under § 504 because MPS failed to educate K.I. in the least restrictive environment.

## LEGAL STANDARDS

### A.  Overview of the IDEA

The purpose of IDEA is "to ensure that all children with disabilities have available

7

to them a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A).[7] Each state that receives federal funding for education must abide by the requirements of the IDEA. 20 U.S.C. § 1412(a)(1)(A). A FAPE, as defined by the IDEA, includes "special education and related services" which range from motor skill training to speech-language pathology services. 34 C.F.R. § 300.39. To ensure that each disabled child is receiving a FAPE, school districts must create an IEP for each student. 20 U.S.C.§ 1414(d).

The first step in creating an IEP is to evaluate the student to determine whether the student has a disability and if so, the extent of the child's educational needs. 34 C.F.R. § 300.301. "In conducting the evaluation, the public agency must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent. . ." 34 C.F.R. § 300.304(b)(1). The assessments should be conducted by "trained and knowledgeable personnel" and be "sufficiently comprehensive to identify all of the child's special education and related service needs." *Id.* at (c)(1)(iv) and (c)(6). The public school must reevaluate the child once every year that a parent or teacher requests an evaluation, but at a minimum must evaluate the child once every three years. 34 C.F.R. § 300.303.

---

[7] A FAPE includes "special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under § 1414(d) of this Title." 20 U.S.C. § 1401(9).

### 1.  Development of an IEP

Next the school must develop an IEP for the disabled student.  The plan must comply with all of the IDEA's procedural requirements and must be "reasonably calculated to enable the child to receive educational benefits."  *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1280 (11th Cir. 2008).  The plan need not provide the child with the best possible education. *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1312 n.1 (11th Cir. 2003) (internal quotation marks omitted).  Rather, the school need only provide an education that "is specifically designed to meet the child's unique needs, supported by services that will permit [her] to benefit from the instruction."  *Id.* (quoting *Pace v. Bogalusa City Schl. Bd.*, 325 F.3d 609, 618–19 (5th Cir. 2003)).  In other words, the school must provide the child with an educational benefit, representing the "basic floor of opportunity."  *CP v. Leon Cnty. Sch. Bd. Fla.*, 483 F.3d 1151, 1153 (11th Cir. 2007) (internal quotation marks omitted).

The IEP must take the form of a written statement that includes: (1) a statement of the child's present levels of academic and functional performance; (2) a statement of measurable and annual goals; (3) a statement of how those goals will be measured; (4) a statement of the special education and related services to be provided; and (5) an explanation of the extent to which the child will not participate with non-disabled children in class.  34 C.F.R. § 300.320.

### 2.  Education in the least restrictive environment

The IDEA requires that each school strive to educate disabled children "to the maximum extent appropriate" "with children who are non-disabled."  34 C.F.R. § 300.114.

9

A disabled child should only be placed in "special classes" or "separate schooling" "when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5).

### 3. *Right to a due process hearing and appeal*

If the disabled child's parents develop a conflict with the entity providing educational benefits to the disabled child, either the parents or the school can request a due process hearing conducted in accordance with state law. The parties are entitled to an impartial hearing officer, the advice of counsel, and the ability to present evidence and cross-examine witnesses. 34 C.F.R. § 300.512. After hearing the evidence, the impartial hearing officer must render a decision regarding whether or not the school district provided the child with a FAPE as that term is used in the statute and corresponding regulations. 34 C.F.R. § 300.513.

The IDEA gives any party aggrieved by the final decision rendered in a due process hearing the right to bring a civil action in a federal district court. 20 U.S.C. § 1415(i)(2)(A). When reviewing such a civil action, the court shall obtain the records of the administrative due process hearing, shall render a decision "on the preponderance of the evidence [and] shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

A court reviewing an administrative decision under the IDEA asks only two questions: (1) whether the school complied with the IDEA's procedural requirements, and (2) whether

10

the IEP developed for the student is "reasonably calculated to enable the student to receive educational benefits." *Loren F.*, 349 F.3d at 1312. "A 'yes' answer to both questions ends judicial review." *Id.* A procedural defect in the development of an IEP does not automatically entitled a party to relief. *Sch. Bd. of Lee Cnty., Fla. v. M.M.*, 348 Fed. App'x 504, 510 (11th Cir. 2009). "In evaluating whether a procedural defect has deprived a student of a FAPE, the court must consider the impact of the procedural defect, and not merely the defect *per se*." *Id.*

### B. Standard of review of an administrative due process decision

The standard by which a district court should review an administrative decision under the IDEA is a murky one. On the one hand, the district court is to conduct a de novo review of the [administrative law judge's] findings. *Sch. Bd. of Collier Cnty., Fla. v. K.C.*, 285 F.3d 977, 981 (11th Cir. 2002). The Eleventh Circuit has explained that "the extent of the deference to be given to the administrative decision is left to the sound discretion of the district court which must consider the administrative findings but is free to accept or reject them." *Walker Cnty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1297–98 (11th Cir. 2000). However, an administrative decision "is entitled to due weight and the court must be careful not to substitute its judgment" for that of the hearing officer. *Id.* Some courts have suggested that an administrative decision is entitled to more weight when matters of educational expertise are involved. *See Loren F.*, 349 F.3d at 1312 n.1. Whatever the applicable standard of review, the district court must render its decision based on the

preponderance of the evidence.  20 U.S.C. § 1415(i).

### C.  Dispositive motion standard in an IDEA case

This case is before the Court on dispositive motions filed by both parties.  In an IDEA case, the traditional rules of summary judgment, as embodied in Federal Rule of Civil Procedure 56, do not apply.  *Loren F.*, 349 F.3d at 1313.  Because it is proper to grant a dispositive motion in an IDEA case even when there are disputed facts, the Eleventh Circuit has characterized the district court's decision as a "judgment on the record."  *Id.*

### D.  Overview of § 504 of the Rehabilitation Act

Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794.  In order to sustain a claim for compensatory damages under § 504, a Plaintiff must demonstrate that the defendants actions were the result of intentional discrimination.  *Wood v. President & Trs. of Spring Hill Coll.*, 978 F.2d 1214, 1219 (11th Cir. 1992).  The Eleventh Circuit has yet to conclusively define "intentional discrimination" in the § 504 special education context.  *See T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 604 (11th Cir. 2010) (leaving open the question of whether to apply a "deliberate indifference" standard or the more stringent "discriminatory animus" standard in § 504 claims).  The Circuit has indicated that either a deliberate indifference or a discriminatory animus standard would apply.  *Id.*

To show deliberate indifference, "a plaintiff must prove that the defendant knew that harm to a federally protected right was substantially likely and that the defendant failed to act on that likelihood." *T.W.*, 610 F.3d at 604 (finding no deliberate indifference on the part of a school that placed student with an abusive teacher because the school "investigated all complaints of abuse," and "were unable to substantiate the complaints"). "To make a claim under section 504 in the education context, something more than an IDEA violation for failure to provide a FAPE in the least restrictive environment must be shown. . . . A plaintiff must also demonstrate some bad faith or gross misjudgment by the school or that he was discriminated against solely because of his disability." *W.C. ex rel. Sue C. v. Cobb Cnty. Sch. Dist.*, 407 F. Supp. 2d 1351, 1363–64 (N.D. Ga. 2005) (citing *N.L. ex rel. Mrs. C. v. Knox County Schs.*, 315 F.3d 688, 695 (6th Cir. 2003)).

### E.  Dispositive motion standard applicable to the § 504 claims

Summary judgment pursuant to Federal Rule of Civil Procedure 56(a)  is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A party may demonstrate the existence of or absence of a genuine dispute as to any material fact by pointing to materials in the record "including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying those evidentiary submissions "which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings" and by its own evidentiary submissions or those on file, demonstrate that there is a genuine factual dispute for trial. *Id.* at 324. The Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## DISCUSSION

The Plaintiffs state the following grounds for relief from the adverse administrative decision:

(1) MPS failed to evaluate K.I., which in turn deprived her of a FAPE;

(2) MPS poorly designed an IEP for K.I., and accordingly deprived her of a FAPE because

(a) K.I. did not have access to assistive technology, and

(b) K.I.'s progress was de minimus;

(3) MPS did not educate K.I. in the least restrictive environment;

(4) MPS deprived K.I. of a FAPE by failing to offer homebound services during K.I.'s absence from school.

### A. MPS's failure to evaluate K.I.

The Plaintiffs argue that MPS violated the procedural requirement of the IDEA by failing to properly evaluate K.I. before developing her IEP. As the Plaintiffs point out, there is no evidence that a cognitive evaluation was ever done for K.I. Accordingly, MPS has no idea whether K.I. is operating in the normal intelligence range. Additionally, there is no evidence that MPS sufficiently evaluated K.I. regarding assistive technology. Because K.I.'s teacher at the Children's Center was not an expert in assistive technology, she was unable to properly design a switch/switch mount combination suitable for K.I.

Until 2005, no one-on-one occupational therapy evaluation was performed on K.I. At the time of the due process hearing, Dr. Vogel had evaluated K.I., and MPS had offered to pay for this evaluation. Without a cognitive or assistive technology assessment, MPS is unable to design suitable goals for K.I. And without the ability to design goals, they are unable to develop an adequate IEP.

This Court finds that MPS did not conduct a comprehensive evaluation of K.I. as required by the IDEA. Federal Regulations require that MPS ensure that "[i]n evaluating each child with a disability. . . the evaluation is sufficiently comprehensive to identify all of

15

the child's special education and related services needs, whether or not commonly linked to the disability category in which the child had been classified." 34 C.F.R. § 300.304(c)(6). The regulations specifically suggest that a disabled child be assessed "in all areas related to the suspected disability," including "general intelligence," "communicative status," and "academic performance."

A school district need not evaluate a child in every conceivable area in order to comply with the IDEA. *See, e.g.*, *M.M. ex rel. Matthews v. Gov't of D.C.*, 607 F. Supp. 2d 168, 173 (D.D.C. 2009) (finding that a school district did not violate the IDEA by choosing not perform a psychiatric evaluation when a psycho-educational evaluation indicated that a psychiatric evaluation was not immediately necessary). However, the record before this Court demonstrates that at the very least, MPS failed to perform either a cognitive evaluation or an assistive technology evaluation of K.I. Without performing those evaluations, MPS was unable to assess K.I.'s general intelligence, communicative status, or academic performance as required by the statute. The record reflects that no one—neither MPS nor K.I.'s parents—actually knows what level of cognitive function K.I. possesses. The record also reflects that until K.I. is able to communicate using a switch or other assistive technology, it will be extremely difficult to determine her level of cognition. Therefore, at a minimum, both cognitive and assistive technology assessments are necessary for the development of appropriate educational goals.

MPS's failure to properly evaluate K.I. is a procedural violation of the IDEA. *See*

*N.B. ex rel. C.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1208 (9th Cir. 2008)

("We conclude that [the school's] failure to meet its obligation to evaluate C.B. in all areas

of suspected disability, including whether he is autistic, was a procedural error that denied

C.B. a FAPE.").  A procedural violation of the IDEA does not automatically result in the

denial of a FAPE.   *Sch. Bd. of Lee Cnty., Fla.*, 348 Fed. App'x at 510.  However, in this

case, MPS's failure to evaluate K.I. corresponded to a failure to develop and adequate IEP.

Without being able to develop appropriate educational goals for K.I., MPS was also unable

to provide her with a FAPE.

Based on this finding, the Court must disagree with hearing officer Cole's decision

to the contrary.  The Court was careful to give due deference to Cole's overall conclusions.

However, Cole does not make an explicit determination about whether MPS adequately

evaluated K.I.  Therefore, the Court is unable to give his decision any deference at all with

regard to whether or not MPS properly evaluated K.I.

### B.  MPS did not appropriately design K.I.'s IEP

As discussed above, the Court finds that MPS failed to properly evaluate K.I.  Without

any idea what K.I.'s intellectual functioning may be, it is impossible to determine reasonable

academic goals for her.  Therefore, the Court cannot find that MPS appropriately designed

K.I.'s IEP.

The Plaintiffs argue that K.I.'s IEP failed to provide a FAPE both because the IEP did

not include the use of assistive technology and because any educational benefit K.I. received

was de minimus.  The Court notes that this opinion neither accepts nor rejects those arguments.  The finding that MPS failed to provide K.I. a FAPE is based only on the Court's conclusion that MPS failed to evaluate K.I.  Without any baseline regarding K.I.'s achievement, MPS could not write a "statement of measurable annual goals, including academic" goals that accurately reflect K.I.'s potential and current level of academic achievement.  If, after further evaluation, it is determined that K.I.'s academic potential is minimal, perhaps the IEP in place at the time of the administrative hearing would provide a FAPE from which K.I. could benefit.

At this juncture, it is worthwhile to catalog all of the different services that Jennie I. requests, without which she claims K.I. cannot receive a FAPE.  Jennie I. requests that K.I. be educated at her neighborhood school, in mainstream education classes.  The neighborhood school would need to provide K.I. nursing services, and only one registered nurse works at that location.[8]  Jennie I. wants to ensure that her child has contact with non-disabled children.  When K.I. is unable to attend mainstream classes, either during long stretches of absence due to surgery or during unexpected absences due to illness, Jennie I. wants MPS to provide homebound services for K.I.[9]

---

[8] As will be discussed below, the Court must also consider the needs of the non-disabled children educated by MPS when analyzing whether a disabled student has been properly mainstreamed.  If the sole nurse employed at a mainstream facility must spend time feeding and suctioning K.I., the non-disabled children located at that facility will have significantly less access to the school nurse.

[9] MPS claims that it had offered homebound services prior to 2005, but that K.I.'s parents refused those services.  Jennie I. now claims that MPS should have requested a

18

Jennie I. wants MPS to provide an occupational therapist who can fit K.I. with new hand splints.  It is unclear whether or not Jennie I. is also requesting that MPS construct and/or provide those splints.  Jennie I. would like MPS to provide more speech and language therapy, including the "extensive use of technology, including switches and battery adaptive toys."  (Doc. # 82 at 25).  Jennie I. also requests that MPS perform an assistive technology evaluation which requires "exhaustive data collection" including an analysis of K.I.'s physical abilities, range of motion, and fatigue level.  This data should include information regarding the best time of day to use the switch, K.I.'s positioning, any distractions in the room, and the activity in which K.I. is asked to participate.

Jennie I. proposes that MPS provide multiple switches, attached to multiple kinds of mounts secured to a place close to K.I.'s body.  Said switches and mounts would need to be mobile so that they could travel with K.I.  (Doc. # 82 at 51).  Jennie I. would prefer that K.I. have her own switches so that she does not have to wait to communicate until other students are finished.  (Doc. # 82 at 46–47).  K.I.'s parents would also need training in order to learn to communicate with K.I. using switches.  More broadly, Jennie I. asks that the district implement all of the suggestions made by Dr. Denise Gibbs, a speech and language specialist, and Dr. Laura Vogel, an occupational therapist.

---

due process hearing to force K.I.'s parents into accepting those homebound services. "Parental involvement in the handicapped child's education is the purpose of many of the IDEA's procedural requirements." *Loren F.*, 349 F.3d at 1313 n.2. It is this Court's opinion that forcing K.I.'s parents to accept homebound services would not serve the spirit of the IDEA, especially when K.I.'s parents are so genuinely interested in her care.

Jennie I. laments the fact that K.I.'s teacher had never worked with a child with arthrogryposis and did not have a medical background.[10]   Jennie I. also expressed dissatisfaction with the hygiene protocols used by the Children's Center, as she believed that poor hygiene there was causing K.I. to become sick too often.  Jennie I. believed that when K.I. was around non-disabled children, she did not get sick as often.  Jennie I. was also upset with the amount of down-time K.I. experienced while at the Children's Center. Jennie I. also points out that the Children's Center was not appropriately equipped for K.I.  Specifically, the classroom does not have a table under which K.I.'s wheelchair can fit, which makes it more difficult for her to participate in group activities.

Jennie I. is dissatisfied with MPS's consultive model of therapy.  In a consultive model, therapists consult with the student's special education teacher about what specific methods to employ. Jennie I. would prefer if these therapists meet individually with K.I. instead, particularly with regard to speech and language therapy and occupational therapy.

Jennie I.'s desire to have the best for her daughter is admirable.  However, this Court is unwilling to say MPS must grant each request in order to provide K.I. with a FAPE.  "The IEP and the IEP's educational outcome need not maximize the child's education." *JSK v. Hendry Cnty. School Bd.*, 941 F.2d 1563, 1573 (11th Cir. 1991).  The adequacy of a FAPE must be "determined on a case-by-case basis in the light of the child's individual needs." *Id.*

---

[10] The Court notes that arthrogryposis is an extraordinarily rare disorder, and it may not be possible to find a teacher in the state of Alabama who has previous experience working with a child suffering from arthrogryposis.

The Court will not, and cannot, determine what MPS must provide K.I. in order to comply with the provisions of the IDEA. Such a task would be impossible without data from K.I.'s cognitive and assistive technology evaluations. However, the Plaintiffs shall keep in mind that under no circumstances must MPS provide K.I. with "maximum improvement," which seems to be what Jennie I. is—understandably—seeking. *Id.* *See also*, Hearing Officer's Decision at 264 ("Petitioner's experts related to maximizing the Child's potential, which is not required by the IDEA.")

### C. MPS did educate K.I. in the least restrictive environment

In *Greer v. Rome City Sch. Dist.*, 950 F.2d 688 (11th Cir. 1991), the Eleventh Circuit set forth a test for determining whether or not a school district has complied with the least restrictive environment mandate of the IDEA. The Circuit withdrew the opinion, but then reinstated the portions of the case relating to the least restrictive environment mandate. 956 F.2d 1025 (11th Cir. 1992); 967 F.2d 470 (11th Cir. 1992). The test set forth in *Greer* has two parts. 950 F.2d at 696. First, the Court asks "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily." *Id.* Second, if the school intends to provide special education services outside of the regular classroom, the Court must ask "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.*

When deciding the first part of the test, i.e. whether or not the school can satisfactorily educate the student in the regular classroom, the Court can consider factors such as (1) the

relative educational benefits the child would receive in the regular classroom versus a special education classroom, (2) the effect that a handicapped child in a regular classroom would have on other children in that classroom, and (3) the cost of the supplemental aids and services that will be necessary to educate the child in a regular classroom. *Id.* at 696–97. This analysis is "an individualized, fact-specific inquiry that requires us to examine carefully the nature and severity of the child's handicapping condition, [her] needs and abilities, and the schools' response to the child's needs." *Id.* at 696.

The Court must note at the outset of this analysis that because no one yet knows K.I.'s cognitive capacity, it is difficult to determine the relative educational benefits she would receive in the regular classroom versus the special education classroom. The Plaintiffs' experts have indicated that K.I. would benefit from having non-disabled role models, and there is no reason to suspect that K.I. would be negatively impacted by non-disabled children. However, K.I.'s current curriculum is so drastically different from her peers' that K.I. is not likely to get much academic benefit from instruction in the regular classroom at this point. The Plaintiffs have presented no evidence that merely using "supplemental aids and services" would sufficiently adapt the regular classroom curriculum to a curriculum appropriate for K.I.

When determining whether a child has been educated in her least restrictive environment, the Court must also analyze whether the presence of the handicapped child in the regular classroom would cause a disturbance to other children. There is no evidence to

suggest that K.I. would cause any kind of behavioral disruption in the classroom, and she certainly doesn't pose a danger to any of the other children.  In fact, her teachers all described her as a sweet child who loves to smile and laugh.  However, she requires two different invasive procedures, feeding with a gastronomy tube and suctioning, that may disrupt the classroom.  The suctioning procedure has the most potential to disrupt the classroom, as it is sometimes performed several times daily.

The Court also notes that it is unclear whether being in the regular classroom would adversely affect K.I.'s health.  Jennie I. had significant concerns about the hygiene at the Children's Center, and believed that those conditions caused K.I. to be sick more often.  It was the hearing officer's opinion—after hearing all of the testimony and reviewing all of the evidence—that any benefit K.I. would receive from interacting with non-disabled children would be outweighed by the chance that exposure to so many children would cause her to suffer more respiratory infections.[11]  More illnesses means that K.I. would spend more time at home, and therefore even less time socializing and learning with other children.

All of these factors suggest that currently, K.I.'s least restrictive environment is the Children's Center, and that K.I. is mainstreamed to the maximum extent possible.  However, federal regulations provide that K.I.'s placement "must be determined annually."  34 C.F.R. 300.116.  Therefore, after K.I. is properly evaluated and a new IEP is created for her, MPS

---

[11]  The Court recognizes that the hearing officer was referring specifically to Vaughn Road Elementary when he made his determination that K.I.'s least restrictive environment was the Children's Center.  However, his rationale applies equally to other mainstream schools.

can re-evaluate whether K.I. will receive any benefit from placement in a mainstream classroom.

### D.  MPS's did not violate the IDEA by failing to offer homebound services

The Plaintiffs also argue that MPS violated the IDEA by failing to offer K.I. homebound services before 2005.  As discussed above, K.I. was absent more than half the school year for several years in a row.  The Plaintiffs suggest that MPS's failure to provide homebound services during those periods of absence is a violation of the IDEA.  The hearing officer determined that MPS had orally offered homebound services prior to 2005, beginning in 2000.  However, until April 2005, K.I.'s parents refused to consider homebound services. There is no dispute that as of 2005, MPS was providing K.I. with homebound services.  In fact, K.I. was no longer attending the Children's Center, and therefore was receiving *only* homebound services.

The Court notes that while some of K.I.'s absences were due to planned surgeries, other absences were unplanned, and due to illness.  Therefore, it was impossible to predict at the beginning of each school year just how many days K.I. would miss due to her disability.  The evidence also demonstrates that the relationship between Jennie I. and MPS was quickly deteriorating.  When the school made the decision not to force homebound services on K.I., it likely did so in order to preserve the little remaining goodwill with Jennie I.

The Plaintiffs claim that because any offer for homebound services prior to 2005 was

24

made orally, such an offer was not sufficient to satisfy the IDEA's requirement that anything affecting the student's placement be included in the written IEP.  The Court finds that the failure to make a written offer as opposed to an oral offer was a procedural violation of the IDEA.  However, that procedural violation does not rise to such a level that it denied K.I. of a FAPE, and accordingly is not actionable.

### E.  Claim brought pursuant to § 504

The Plaintiffs also bring a claim for damages pursuant to § 504 of the Rehabilitation Act.  As discussed above, the Plaintiffs must demonstrate at a minimum that MPS acted with bad faith or gross misjudgment.  As MPS has moved for summary judgment on this claim, the Plaintiffs bear the burden of presenting facts that create a genuine issue of material fact which would necessitate a trial.  In their response to MPS's motion for summary judgment, the Plaintiffs present the following facts to demonstrate that MPS acted with bad faith or gross misjudgment:

(1) MPS failed to have a continuum of alternative placements available for disabled students;

(2) MPS made its decision regarding K.I.'s placement without consulting a physician;

(3) MPS relied on "speculation about K.I.'s health and stereotypes about her potential to justify placing her in a segregated facility";

(4) An employee of MPS admitted that MPS's placement of K.I. in the

Children's Center was based on a "backward" application of the IDEA; and

(5) MPS failed to evaluate K.I. before placing her in the Children's Center.

The Plaintiffs' entire § 504 claim is based on the contention that MPS violated K.I.'s rights by placing her in the Children's Center. This Court has found that MPS did not violate the IDEA by placing K.I. in the Children's Center. Since a plaintiff must demonstrate *more* than a violation of the IDEA in order to recover under § 504, it is virtually impossible to establish a violation of § 504 if the school district has complied with the IDEA. *See Doe v. Arlington Cnty. School Bd.*, 41 F. Supp. 2d 599, 609 (E.D. Va. 1999) ("[I]t would be legally untenable to conclude that, in providing for the plaintiff's education, in a manner that fully complies with the IDEA, the district officials nevertheless, acted in bad faith, or with gross misjudgment."); *H. v. Montgomery Cnty. Bd. of Educ.*, — F. Supp. 2d —, 2011 WL 1811689 at *13 (M.D. Ala. May 12, 2011) (Albritton, J.) (explaining the origins of the proposition that "§ 504 claims necessarily require more than IDEA violations"). Accordingly, the Plaintiffs' Motion for Summary Judgment is due to be denied on these claims, and MPS's motion for Summary Judgment is due to be granted.

### F. The Plaintiffs' requests for relief

The Plaintiffs include in their complaint a request for reasonable attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B). The statute provides that "[i]n any action of proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party. A separate order will be entered

regarding this claim for attorneys fees.  The separate order will also pertain to the Plaintffs'
request that they be declared the prevailing party in this action and request for compensatory
education.

The Plaintiffs also request a declaration that MPS's practices, policies, procedures,
and conditions violated K.I.'s rights.  The Court will include a declaration in the final
judgment that MPS violated K.I.'s right to a FAPE by failing to comprehensively evaluate
her and develop an adequate IEP.  The Plaintiffs' request for declaratory relief is due to
DENIED in all other respects.

The Plaintiffs also request a permanent injunction enjoining MPS from continuing to
violate K.I.'s rights under the IDEA and § 504.  This request is due to be DENIED, but the
Court will order MPS to re-evaluate K.I. and develop a new IEP for her in a manner
consistent with this memorandum opinion and order.

## CONCLUSION

It is hereby ORDERED that:

1.  The Plaintiffs' Motion for Reversal of Administrative Decision (Doc. # 81) is
GRANTED in part and DENIED in part, consistent with this memorandum opinion;

2.  The Plaintiffs' Motion for Partial Summary Judgment (Doc. # 83) is DENIED.

3.  The Defendant's Motion for Summary Judgment (Doc. # 79) is GRANTED.

4.   The Plaintiffs' request for permanent injunction is GRANTED in part and
DENIED in part as set out in this memorandum opinion.

5.   The Plaintiffs' request for declaratory relief is DENIED as set out in this memorandum opinion.

Done this the 24th day of August, 2011.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE